**STATE of Minnesota, Respondent,**

v.

**Jeffrey Allen SILVERNAIL, Appellant.**

**No. A12–0021.**

Supreme Court of Minnesota.

May 31, 2013.

Lori Swanson, Attorney General, James B. Early, Assistant Attorney General, Saint Paul, MN; and Timothy E.J. Fox, Wilkin County Attorney, Breckenridge, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Roy G. Spurbeck, Assistant State Public Defender, Saint Paul, MN, for appellant.

## OPINION

PAGE, Justice.

A jury found appellant Jeffrey Silvernail guilty of first-degree premeditated murder and second-degree intentional murder for the shooting death of Lori Roberts. The district court convicted Silvernail of first-degree premeditated murder and sentenced him to life imprisonment without the possibility of release. On appeal, Silvernail challenges his conviction on two grounds. First, he claims that the record contains insufficient evidence to sustain his conviction of first-degree premeditated murder because the State failed to prove beyond a reasonable doubt at trial that he murdered Roberts. Second, he argues that the court committed reversible error by locking the courtroom doors before the State began its closing argument, which violated the public trial guarantees of the United States and Minnesota Constitutions. We affirm Silvernail's conviction.

## I.

Silvernail and Roberts were romantically involved and lived together in Roberts' home. Several days before Roberts' death, Silvernail discovered that Roberts had started an intimate relationship with

J.B. Silvernail later sent the following text message to Roberts: "I am very upset. We need to have a serious and the truth talk about Gary." Although Silvernail's text message referred to someone named "Gary," it included J.B.'s telephone number. Approximately 20 minutes later, Roberts sent a text message to J.B. stating that she "just told him!!" The following week, Silvernail informed his son and a coworker that he was moving out of Roberts' home because his relationship with Roberts had ended.

The evidence presented at trial established the following timeline for the hours surrounding Roberts' death on the morning of October 2, 2009. Roberts arrived at her job at 5:00 p.m. on the evening of October 1. While Roberts was at work, Silvernail packed his belongings at Roberts' home. Roberts left work nearly 10 hours later, at approximately 3:00 a.m.; picked up her daughter; and then returned home. Between 6:00 a.m. and 6:20 a.m., two of Roberts' neighbors saw Silvernail's vehicle in Roberts' driveway. Silvernail arrived at his job at 7:07 a.m., but then left at 8:30 a.m. to retrieve some of his belongings from Roberts' home. Approximately 15 minutes after leaving work, Silvernail called 911 to report that he had found Roberts' dead body in her home.

The police interviewed Silvernail that day. Silvernail told the police that Roberts had recently broken up with him "more or less on her lines" and that he was in the process of moving out. He further informed the police that he had left Roberts' home shortly after Roberts returned from work that morning, which he estimated was at 2:30 a.m. or 3:00 a.m. When he returned at around 8:45 a.m., he was surprised to see that Roberts' bedroom door was open. After seeing Roberts' body and blood in the bedroom, he called 911. He admitted that he owned several firearms, all of which were kept in a locked closet on the upper level of Roberts' home. Silvernail later gave the police his clothes, consented to a search of his apartment, and allowed the police to take a sample of his DNA.

The county medical examiner conducted an autopsy of Roberts' body and concluded that she died from two gunshot wounds: one in the neck and the other in the chest. The Minnesota Bureau of Criminal Apprehension (BCA) determined that Roberts was shot in the chest on the bed, and then shot a second time in the neck while she was on the floor at the foot of the bed. The police found two bullets in Roberts' bedroom, but did not find the murder weapon or any shell casings. Crime scene investigators determined that both bullets recovered from the bedroom were fired from the same gun and could have been fired from a Hi–Point Compact 9mm pistol. At trial, the State introduced evidence that one of Silvernail's firearms was a Hi–Point Compact 9mm pistol, which was missing and unaccounted for, and that Roberts' injuries were consistent with Roberts having been shot by a Hi–Point Compact 9mm pistol.

The BCA examined the forensic evidence recovered from Roberts' home. A DNA sample obtained from the blood-soaked T-shirt that Roberts wore on the night of the murder matched two or more males, but the predominant profile matched Silvernail's DNA. Other DNA evidence found in Roberts' home was inconclusive. Crime scene investigators also seized and examined three computers from Roberts' home. The BCA determined that Silvernail's laptop, which the police found in the living room of Roberts' home, was used between 4:02 a.m. and 4:14 a.m. on the morning of the murder to access an online-gaming website. A desktop com-

puter, which belonged to Roberts, was used at approximately the same time.

Although Silvernail initially denied having any knowledge of Roberts' relationships with any other men, he admitted during a subsequent interview with the police that he learned of Roberts' potential relationship with J.B. on September 26—the night he sent the text message telling Roberts that they needed to have a serious "truth talk." Silvernail continued to deny, however, that he was present at Roberts' home at 6:20 a.m. on the morning of the murder, when neighbors saw Silvernail's vehicle in Roberts' driveway.

The police arrested Silvernail after learning that the BCA had identified Roberts' blood on the pants that Silvernail wore on the day of the murder. Following the arrest, Silvernail shared a "pod" with D.M. at the Wilkin County Jail. At Silvernail's trial, D.M. testified that Silvernail confessed to him. Silvernail told D.M. that Silvernail killed Roberts after he "got into a pissing match" with her on the morning of the murder. Silvernail also admitted that he left "the house in Doran and then he came back and that's when he shot her." Silvernail then "moved stuff" around in Roberts' home to make the murder look like a burglary. According to D.M., Silvernail was surprised that the police arrested him for the crime because no one had recovered the murder weapon or his tennis shoes, which were "[in] a sinking piece of concrete." Silvernail also told D.M. that the missing murder weapon was in the Hudson River. D.M. thought that Silvernail confided in him because no one would believe "a convict's story," even though D.M. told Silvernail that he would not "keep [his] mouth shut."

The jury found Silvernail guilty of both first-degree premeditated murder and second-degree intentional murder. The district court convicted Silvernail of first-de-

gree premeditated murder and sentenced him to life imprisonment without the possibility of release. This appeal followed.

## II.

◼ The first question presented by this case is whether the State presented sufficient evidence that Silvernail, rather than an unidentified alternative perpetrator, caused Roberts' death. *See* Minn. Stat. § 609.185(a)(1) (2012) (requiring the State to prove in a first-degree premeditated murder case that the defendant "cause[d] the death of a human being"). Silvernail's sufficiency-of-the-evidence claim raises the broader question of the applicable standard for reviewing the sufficiency of the evidence when the State presents both direct and circumstantial evidence to obtain a conviction. Silvernail contends that the circumstantial-evidence standard applies whenever the State's proof at trial depends in whole or in part on circumstantial evidence. The State disagrees. We need not resolve the parties' dispute regarding the standard of review because, even under the more favorable standard proposed by Silvernail, the record contains sufficient evidence to support the jury's verdict that Silvernail is guilty of first-degree premeditated murder. *Cf. State v. Sanders*, 775 N.W.2d 883, 888 (Minn.2009) (explaining that we did not need to decide which harmless error standard applied "because even under the more favorable constitutional harmless-error standard, Sanders was not prejudiced").

◼ Under the circumstantial-evidence standard, we apply a two-step analysis. *State v. Ortega*, 813 N.W.2d 86, 100 (Minn.2012). The first step is to identify the circumstances proved. *State v. Andersen*, 784 N.W.2d 320, 329 (Minn.2010). In identifying the circumstances proved, we defer " 'to the jury's acceptance of the

proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved ·by the State.'" *Id.* (quoting *State v. Stein,* 776 N.W.2d 709, 718 (Minn.2010) (plurality opinion)). As with direct evidence, we "construe conflicting evidence in the light most favorable to the verdict and assume that the jury believed the State's witnesses and disbelieved the defense witnesses." *State v. Tscheu,* 758 N.W.2d 849, 858 (Minn.2008). Stated differently, in determining the circumstances proved, we consider only those circumstances that are consistent with the verdict. *State v. Hawes,* 801 N.W.2d 659, 668–69 (Minn. 2011). This is because the jury is in the best position to evaluate the credibility of the evidence even · in cases based on circumstantial evidence. *Id.* at 670.

The second step is to "determine whether the circumstances proved are 'consistent with guilt and inconsistent with any rational hypothesis except that of guilt.'" *State v. Palmer,* 803 N.W.2d 727, 733 (Minn.2011) (quoting *Andersen,* 784 N.W.2d at 330). We review the circumstantial evidence not as isolated facts, but as a whole. *State v. Hurd,* 819 N.W.2d 591, 599 (Minn.2012). We "'examine independently the reasonableness of all inferences that might be drawn from the circumstances proved'; [including the] inferences consistent with a hypothesis other than guilt." *Andersen,* 784 N.W.2d at 329 (quoting *Stein,* 776 N.W.2d at 716 (plurality opinion)). Under this second step, we must "determine whether the circumstances proved are 'consistent with guilt and inconsistent with any rational hypothesis except that of guilt,' not simply whether the inferences that point to guilt are reasonable." *Palmer,* 803 N.W.2d at 733 (quoting *Andersen,* 784 N.W.2d at 330). We give "no deference to the fact finder's choice between reasonable infer-

ences." *Andersen,* 784 N.W.2d at 329–30 (citation omitted) (internal quotation marks omitted).

Here, the circumstantial evidence is sufficient to support the jury's verdict. The circumstances proved are these. The two bullets that killed Roberts were fired from the type of gun that Silvernail owned and kept in a locked closet in Roberts' home. After the murder, the gun was missing from the closet. There was no evidence that the closet had been broken into. Silvernail was the only person who had a key to the closet. Silvernail's laptop, which police found in Roberts' living room, was used between 4:02 a.m. and 4:14 a.m. on the· morning of the murder. Roberts' desktop computer was also used around the same time. Silvernail's car was parked in Roberts' driveway between 6:00 a.m. and 6:20 a.m. on the morning of the murder. The medical examiner determined that Roberts was murdered at or before 6:20 a.m. that day. Other than the murderer, Roberts and her disabled daughter were the only other persons present in Roberts' home when the crime was committed. The predominant profile of the DNA sample taken from a blood-soaked shirt that Roberts wore on the night of the murder matched Silvernail's DNA. Roberts' blood was present on the pants that Silvernail wore on the day of the murder. And while Silvernail initially denied having any knowledge that Roberts was in a relationship with another man, he later admitted that he was aware of Roberts' relationship with J.B.

One can reasonably infer from the medical examiner's estimated time of death and Silvernail's car being parked in Roberts' driveway around the same time that Silvernail was in Roberts' home at the time she died. It can also be inferred that Silvernail was not telling the truth when he denied being in Roberts' home from

2:30 a.m. to 8:45 a.m. on the morning she was murdered based on evidence that (1) Silvernail's car was in Roberts' driveway between 6:00 a.m. and 6:20 a.m. that morning, and (2) Silvernail's computer, which was in Roberts' home, was used between 4:02 a.m. and 4:14 a.m. that morning.

The only reasonable inference to be drawn from the evidence that Roberts was killed by the type of bullets that would have been fired from Silvernail's gun, that the gun was kept in a locked closet in the house, that Silvernail was the only one who had a key to the closet, that the gun was missing immediately after the murder, and that there were no signs of forced entry into the closet where the gun was kept, is that Silvernail shot Roberts with his gun. From the fact that Silvernail's gun was missing after the murder and never recovered, it can be inferred that Silvernail disposed of the gun after the murder to avoid detection. One can also infer from Silvernail's untruthful statement about not knowing that Roberts was involved with another man that Silvernail had a motive to kill Roberts. Finally, the fact that Roberts' blood was on Silvernail's pants supports a reasonable inference that Silvernail was present when Roberts was shot, particularly because in his initial statements Silvernail claimed that he did not get near enough to Roberts' body to get blood on his clothing. Viewing the evidence as a whole, the only reasonable inference to be drawn from the circumstances proved is that Silvernail killed Roberts.

At the same time, there are no reasonable inferences to be drawn from the circumstances proved that Roberts was killed by another individual. *See Andersen,* 784 N.W.2d at 329 (explaining that the court must "examine independently the *reasonableness* of all inferences that might be drawn from the circumstances proved") (emphasis added) (citation omitted) (inter-

nal quotation marks omitted). Thus, the circumstances proved lead unerringly to the conclusion that the evidence in the record is sufficient to establish Silvernail's guilt beyond a reasonable doubt.

### III.

■ The second question presented by this case is whether the district court violated the public trial guarantees of the United States and Minnesota Constitutions by locking the courtroom doors during the State's closing argument. Before the State's closing argument, the court stated:

> I will state for the spectators in the courtroom, as a courtesy to everyone who is involved, if you're in the courtroom now, you're in the courtroom until there's a break. If you're not in the courtroom now, which obviously they can't hear me if they weren't, they have to stay out until there is a break. Going in and out obviously creates some disruptions and distractions that—that we don't want to have. So if you don't feel that you can stay here until a break, then now is the time for you to step out.

■ Whether the district court violated Silvernail's right to a public trial is a constitutional question that we review de novo. *State v. Brown,* 815 N.W.2d 609, 616 (Minn.2012). The Sixth Amendment to the United States Constitution and Article I, Section 6, of the Minnesota Constitution both provide that "the accused shall enjoy the right to a ... public trial." U.S. Const. amend. VI; *accord* Minn. Const. art. I, § 6. The United States Supreme Court has explained that the Sixth Amendment right to a public trial is for "the benefit of the accused," permitting the public to see that the defendant is "fairly dealt with and not unjustly condemned." *Waller v. Georgia,* 467 U.S. 39, 46, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (citation

omitted) (internal quotation marks omitted).

■ However, some courtroom closures are "too trivial to amount to a violation of the [Sixth] Amendment." *State v. Lindsey,* 632 N.W.2d 652, 660 (Minn.2001) (alteration in original) (citation omitted) (internal quotation marks omitted). Recently, in *Brown,* we concluded that a district court's decision to lock the courtroom doors during jury instructions did not violate a defendant's right to a public trial. 815 N.W.2d at 618. In reaching that conclusion, we identified several factors, first articulated in *Lindsey,* indicating that the courtroom closure was too trivial to violate the defendant's right to a public trial. Those factors included: (1) the courtroom was never cleared of all spectators; (2) the trial "remained open to the general public and the press"; (3) there was no period of the trial in which members of the general public were absent; and (4) neither the defendant, the defendant's family or friends, nor any witnesses were improperly excluded from the trial. *Id.* at 617–18.

We reach the same conclusion here. First, the district court did not remove any spectators when it locked the courtroom doors before the State's closing argument. To the contrary, the court expressly instructed the spectators who were present in the courtroom that they were entitled to stay. Second, the trial remained open to the public and any press that were already present in the courtroom. Third, the record does not contain any evidence that locking the courtroom doors denied any members of the public, Silvernail's family or friends, or any witnesses access to the trial.

In fact, *Brown* is distinguishable only because the closure in this case occurred at a different stage of the criminal trial: the State's closing argument rather than the reading of the jury instructions. That distinction, however, does not alter the constitutional analysis, particularly because the *Lindsey* factors point equally to the conclusion in both instances that the closures were trivial. *See People v. Woodward,* 4 Cal.4th 376, 14 Cal.Rptr.2d 434, 841 P.2d 954, 955, 959–60 (1992) (holding that the district court's act of locking the courtroom doors and posting a "do not enter" sign outside the courtroom for approximately 90 minutes while the prosecutor completed his closing argument did not violate the defendant's public-trial right). Indeed, appellant recognizes that our reasoning in *Brown* governs, but "respectfully disagrees" with that decision and "raises the [public-trial claim] here to preserve it for possible further review."[1] We therefore hold, based on *Brown* and our application of the *Lindsey* factors, that the district court did not violate Silvernail's right to a public trial when it locked the courtroom doors during the State's closing argument.[2]

---

**1.** The dissent, despite its forceful tone, eventually concedes that *Brown* is binding and forecloses Silvernail's claim that the district court violated his right to a public trial. The dissent nevertheless contends that we should reconsider *Brown* and overrule it. We decline the dissent's invitation. "[W]e are extremely reluctant to overrule our precedent under principles of *stare decisis* " in the absence of a "compelling reason" to do so. *State v. Hokanson,* 821 N.W.2d 340, 350 (Minn.2012) (citation omitted) (internal quotation marks omitted). The dissent offers no compelling reason for us to reconsider *Brown*—a decision not yet a year old.

**2.** Although the closure in this case occurred before we decided *Brown,* we repeat our admonitions that the "act of locking the courtroom doors" should be employed only "carefully and sparingly" and that "the better practice is for the trial court to expressly state on the record why the court is locking the courtroom doors" so that meaningful appellate review is possible. 815 N.W.2d at 618

## IV.

For the foregoing reasons, we conclude that there is no reversible error in this case. Accordingly, we affirm Silvernail's conviction of first-degree premeditated murder.

Affirmed.

STRAS, Justice (concurring in part).

Our case law on sufficiency of the evidence is confusing and ambiguous in its application. I write separately because this case provides us with the opportunity to provide needed clarification to the standard for reviewing the sufficiency of the evidence when the State presents a combination of direct and circumstantial evidence in support of a criminal conviction. Rather than addressing that important and unsettled question, however, the court instead embarks on a fanciful voyage in which it assumes without deciding that our "circumstantial evidence standard" applies to the sufficiency of the *direct* evidence presented by the State—an approach that only amplifies the confusion in our case law. The court's approach does not provide any guidance regarding how to assess the sufficiency of the evidence in mixed evidence cases—perhaps the most common category of cases that we review. I therefore write separately to do what the court will not: articulate a standard for evaluating the sufficiency of the evidence when the State presents a combination of direct and circumstantial evidence in support of a criminal conviction.

## I.

Silvernail's primary argument on appeal is simple: in his view, the State failed to prove beyond a reasonable doubt that he—as opposed to an unidentified alternative perpetrator—caused Roberts's death. *See*

Minn.Stat. § 609.185(a)(1) (2012) (requiring the State to prove that the defendant "cause[d] the death of a human being" in a first-degree premeditated murder case). In addressing that question, the parties disagree about the applicable standard of review. The State argues that the "circumstantial evidence standard" does not apply here because it proved that Silvernail killed Roberts through a combination of direct and circumstantial evidence. In contrast, Silvernail contends that the "circumstantial evidence standard" applies whenever the State's proof at trial depends in whole or in part on circumstantial evidence. Neither party disputes that the State presented a combination of direct and circumstantial evidence to prove the killer's identity. Rather, the parties fundamentally disagree about the relevant legal rule in such circumstances—a question upon which we have given conflicting answers.

The court ignores the parties' dispute about the standard of review and does not acknowledge, much less address, our conflicting articulations of the rule for evaluating the sufficiency of the evidence when the State presents a combination of direct and circumstantial evidence in support of a conviction. We have given no less than four different answers to the question of how to evaluate the sufficiency of the evidence in mixed evidence cases. In *State v. Palmer*, for example, we applied the "circumstantial evidence standard" because "the evidence of premeditation in th[e] case was *largely, although not exclusively, circumstantial.*" 803 N.W.2d 727, 733 (Minn.2011) (emphasis added); *see also State v. Boldman*, 813 N.W.2d 102, 107 (Minn.2012) (applying the circumstantial evidence standard of review because "[t]he evidence of appellant's intent to kill ... was *largely* circumstantial" (emphasis add-

(citation omitted) (internal quotation marks omitted).

ed)). In *State v. Ortega*, we evaluated the evidence of premeditation under the "circumstantial evidence standard" because "the State *relied heavily* on circumstantial evidence." 813 N.W.2d 86, 100 (Minn. 2012) (emphasis added). In *State v. Moore*, we articulated yet a third rule: the "circumstantial evidence standard" applies when "[*m*]*uch* of the evidence presented by the State is circumstantial." 481 N.W.2d 355, 360 (Minn.1992) (emphasis added). Finally, in *State v. Flowers*, we declined to apply the "circumstantial evidence" standard altogether because "[t]he State presented direct evidence on each element of the offense of aiding and abetting first-degree murder," even though some of the evidence linking Flowers to the crime was circumstantial. 788 N.W.2d 120, 133 n. 2 (Minn.2010). It is no mystery why litigants are confused about our sufficiency of the evidence jurisprudence.

Without any explanation, the court dodges a fundamental legal question squarely presented for our review. There are no doubt instances in which sound principles of judicial restraint dictate that we "refrain from deciding any issue not essential to the disposition of the particular controversy before us." *See Navarre v. S. Wash. Cnty. Sch.*, 652 N.W.2d 9, 32 (Minn.2002) (citation omitted) (internal quotation marks omitted); *see also Mills v. Green*, 159 U.S. 651, 653, 16 S.Ct. 132, 40 L.Ed. 293 (1895) (stating that the duty of every "judicial tribunal[ ] is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it"). But by simply assuming that the "circumstantial evidence" standard applies to Silvernail's sufficiency claim, the court does not "avoid[ ] throwing settled law into confusion," but instead "preserves a chaos that

is evident to anyone who can read and count." *Webster v. Reprod. Health Servs.*, 492 U.S. 490, 535, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989) (Scalia, J., concurring). We can and should do better.

## II.

I now turn to the question *actually* presented by this case: what standard applies to a criminal conviction proven through a combination of direct and circumstantial evidence. Under our "traditional standard" for evaluating the sufficiency of the evidence, we limit our review to a "painstaking analysis of the record to determine whether the evidence, when viewed in the light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *Ortega*, 813 N.W.2d at 100 (citation omitted) (internal quotation marks omitted). We assume that "the jury believed the State's witnesses and disbelieved any evidence to the contrary," and we do not "disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense." *Id.*

In contrast, a heightened, two-step "circumstantial evidence standard" applies when the State secures a conviction with circumstantial evidence. The "circumstantial evidence standard" requires us to first identify the circumstances proved by the State, deferring to the jury's acceptance of the State's proof of these circumstances and rejection of any evidence in the record to the contrary. *State v. Anderson*, 789 N.W.2d 227, 241–42 (Minn.2010). We then "independently examine the reasonableness of all inferences that might be drawn from the circumstances proved, including inferences consistent with a hypothesis other than guilt." *Id.* at 242 (citation omit-

ted) (internal quotation marks omitted). If the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis other than guilt, then the evidence is sufficient to sustain the conviction. *Id.*

The "circumstantial evidence standard" applies in two situations. First, it governs cases in which the evidence supporting a conviction consists solely of circumstantial evidence. *See, e.g., Bernhardt v. State,* 684 N.W.2d 465, 477 (Minn.2004) (applying the "circumstantial evidence standard" because the defendant's conviction was "based entirely on circumstantial evidence"); *State v. Jones,* 516 N.W.2d 545, 548–49 (Minn.1994) (applying the "circumstantial evidence standard" because the defendant's assault convictions were based solely on circumstantial evidence). Second, it operates in cases in which the State proves a disputed *element* of a criminal offense exclusively by circumstantial evidence, even if the State presents direct evidence on other elements of the offense. *See State v. Al–Naseer,* 788 N.W.2d 469, 474–75 (Minn.2010).

This case, however, falls into neither of those two categories. Rather, the State's proof at trial on the disputed element in this case—whether Silvernail caused Roberts's death—consisted of a combination of direct and circumstantial evidence. When the evidence on an element is mixed, our case law does not yield a clear answer about whether the "traditional standard" or the "circumstantial evidence standard" governs.

In my view, the resolution of the lingering uncertainty in our case law turns on the differences between direct and circumstantial evidence and the rationale underlying the "circumstantial evidence standard." We have defined "direct evidence" as " '[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption.' " *Bernhardt,* 684 N.W.2d at 477 n. 11 (alteration in original) (quoting *Black's Law Dictionary* 596 (8th ed.2004)). Stated differently, direct evidence, if believed, directly proves the existence of a fact without requiring any inferences by the fact-finder. Circumstantial evidence, on the other hand, is " '[e]vidence based on inference and not on personal knowledge or observation.' " *Id.* (alteration in original) (quoting *Black's Law Dictionary* at 595). By definition, the fact-finder must make an inference from circumstantial evidence in order to find the ultimate fact—often the existence of an element of a criminal offense—asserted by the proponent of the evidence. *See United States v. MacPherson,* 424 F.3d 183, 189 (2d Cir.2005) (explaining that "the *mens rea* elements of knowledge and intent can often be proved through circumstantial evidence and the reasonable inferences drawn therefrom"). When presented with circumstantial evidence on an element, the fact-finder may face two reasonable inferences from the circumstances proved by the State: one that points to the defendant's guilt and another that points to the defendant's innocence. *Cf. State v. Taylor,* 650 N.W.2d 190, 206 (Minn.2002); *State v. Johnson,* 173 Minn. 543, 545–46, 217 N.W. 683, 684 (1928). When there is a reasonable hypothesis pointing to the defendant's innocence, we have long held that the State has failed to sustain its burden of proving the defendant's guilt beyond a reasonable doubt. *See State v. Webb,* 440 N.W.2d 426, 430–31 (Minn.1989); *State v. Kaster,* 211 Minn. 119, 121, 300 N.W. 897, 899 (1941).

The dangers associated with circumstantial evidence—that the fact-finder might make unfounded inferences or draw unreasonable conclusions based on mere probabilities—no longer exist when direct evidence establishes the existence of an ul-

timate fact. *See People v. Kennedy*, 47 N.Y.2d 196, 417 N.Y.S.2d 452, 391 N.E.2d 288, 290–91 (1979) (noting that "cases involving circumstantial evidence must be closely reviewed because they often require the jury to undertake a more complex and problematical reasoning process than do cases based on direct evidence"). The reason is that direct evidence establishes the existence of the ultimate fact directly, without requiring the fact-finder to make any inferences. *Bernhardt*, 684 N.W.2d at 477 n. 11; *see also Radomsky v. United States*, 180 F.2d 781, 783 (9th Cir.1950) (explaining that "[d]irect evidence establishes the fact to be proved without the necessity for . . . inference").

Silvernail's confession to D.M. illustrates the point. According to D.M.'s testimony, Silvernail admitted to killing Roberts. Once the jury accepted D.M.'s testimony, the jury did not need to make any factual inferences in order to conclude that Silver-

nail caused Roberts's death. *See State v. McClain*, 208 Minn. 91, 95–96, 292 N.W. 753, 755 (1940) ("Confessions are held to be direct, rather than circumstantial, evidence of guilt."). Rather, the jury only needed to conclude that D.M. was a credible witness [1]—a determination that is "a function exclusively for the jury." [2] *State v. Pippitt*, 645 N.W.2d 87, 94 (Minn.2002); *see also State v. Bolstad*, 686 N.W.2d 531, 540 (Minn.2004) (declining to "usurp[ ] the jury's role in assessing credibility"). Because direct evidence establishes the existence of the disputed element directly—here, that Silvernail caused Roberts's death—there is no reason to evaluate the reasonableness of inferences that the jury is *never* required to make. Accordingly, I would hold that the "circumstantial evidence standard" does not apply to our review of an element of a criminal offense that the State has proven by direct evidence.

---

1. Silvernail argues that the court should adopt a rule according less weight to the testimony of jailhouse informants because their testimony is inherently unreliable. I would reject Silvernail's argument because it would introduce an arbitrary—and potentially unworkable—distinction that would require courts to accord varying weight to confessions based on the identity of the witness. More importantly, such a rule would encroach upon the exclusive province of the jury to assess the credibility and weight of witness testimony. *See State v. Engholm*, 290 N.W.2d 780, 784 (Minn.1980) ("[I]t is well-settled in Minnesota that it is the province of the jury to determine the credibility and weight to be given to the testimony of any individual witness.").

2. D.M.'s testimony arguably constitutes direct evidence that Silvernail made the statement to D.M. but only circumstantial evidence that Silvernail killed Roberts. *See, e.g., Wright v. Southland Corp.*, 187 F.3d 1287, 1295 n. 9 (11th Cir.1999) (noting in an employment discrimination case that "testimony from another individual . . . of statements made by the decisionmaker" is "direct evidence of the fact that the decisionmaker made the alleged

statement . . . [but] merely circumstantial evidence of the fact that the employer illegally discriminated against [an employee]"); *People v. Koenig*, 29 Cal.2d 87, 173 P.2d 1, 3 (1946) ("[T]he testimony of a witness that the defendant admitted guilt . . . [is] direct evidence that an admission or confession was made by the defendant but circumstantial evidence of the truth of what was admitted."), *overruled in part by People v. Gould*, 54 Cal.2d 621, 7 Cal.Rptr. 273, 354 P.2d 865 (1960).

I decline to view the scope of direct evidence so narrowly, however, because it fails to account for the critical distinction between a reasonable inference drawn from the circumstances proved and the evaluation of the credibility of witnesses. Unlike inferences based on the circumstances proved, only the jury may evaluate the credibility of witnesses. *See State v. Bliss*, 457 N.W.2d 385, 391 (Minn. 1990) ("Defendant's attempt to retry his case by asking us to reevaluate [a witness's] credibility is contrary to our role."). Applying these principles here, when D.M. recounted Silvernail's confession at trial, the only inference the jury needed to make was that D.M. and Silvernail were credible—an assessment that we have long vested with the jury.

The element-by-element approach that I would adopt is consistent with *Al–Naseer*, in which we held that the "circumstantial evidence standard" applies to individual elements of a criminal offense that are proven by circumstantial evidence, even when the State proves the other elements of the offense by direct evidence. 788 N.W.2d at 474. Significantly, we declined to adopt an all-or-nothing approach in *Al–Naseer*, rejecting the court of appeals' rule that applied the "circumstantial evidence standard" only when every element of a criminal offense had been proven by circumstantial evidence. *Id.; see also State v. Leake*, 699 N.W.2d 312, 319–21 (Minn. 2005) (applying the "circumstantial evidence standard" to the element of premeditation despite the fact that direct evidence supported other elements of the offense).

Silvernail urges the court to apply the "circumstantial evidence standard" based on *Palmer*, a case in which the defendant challenged, as relevant here, the sufficiency of the evidence on his conviction of first-degree premeditated murder. 803 N.W.2d at 730. In *Palmer*, we applied the "circumstantial evidence standard," describing the evidence of premeditation as "largely, although not exclusively, circumstantial." *Id.* at 733. One could reasonably read *Palmer* as indicating that the State presented a combination of direct and circumstantial evidence on the element of premeditation. But such a reading cannot be squared with the facts of *Palmer*. Although the State presented direct evidence on other elements of the offense—such as eyewitness testimony that Palmer caused

the victim's death—the State's evidence of premeditation was entirely circumstantial. Indeed, there was no confession or statement by Palmer indicating that he "consider[ed], plan[ned] or prepare[d] for, or determine[d] to commit" the murder prior to its commission. Minn.Stat. § 609.18 (2012) (defining premeditation); *see also DeLisle v. Rivers*, 161 F.3d 370, 389 (6th Cir.1998) ("Rarely is direct evidence of premeditation and intent to kill available in a murder case, except where a confession is received in evidence."). Nor did the parties in that case argue otherwise. Accordingly, I read *Palmer* as consistent with the rule I propose today: the "traditional standard" applies when the direct evidence is sufficient to prove the disputed element.

In this case, the direct evidence is sufficient to affirm Silvernail's conviction. I would therefore apply the "traditional standard" to evaluate the evidence presented at Silvernail's trial. Here, Silvernail admitted to D.M. that he killed Roberts and that he "moved stuff" around to make the scene of the crime look like a burglary.[3] On review for sufficiency of the evidence, we assume that the jury believed D.M.'s testimony and disbelieved any evidence to the contrary. *See Pippitt*, 645 N.W.2d at 94. Because the jury heard evidence that Silvernail confessed to killing Roberts, I would conclude that the evidence was sufficient for the jury to have reasonably concluded that Silvernail, rather than an unidentified alternative perpetrator, killed Roberts.[4]

---

**3.** I acknowledge that Minnesota law contains an additional requirement when the only direct evidence is in the form of a confession. *See* Minn.Stat. § 634.03 (2012). Because Silvernail does not argue that section 634.03 requires reversal of his conviction, the applicability of that statute is not before us. *See State v. Powers*, 654 N.W.2d 667, 676 (Minn.

2003) (stating that "[i]ssues not addressed by a party's brief are considered waived" on direct appeal).

**4.** Because I conclude that the direct evidence, standing alone, is sufficient to support the jury's verdict in this case, I need not, and do not, address whether a different standard would have applied if the direct evidence had

DIETZEN, Justice (concurring).

I join in the concurrence of Justice Stras.

ANDERSON, Paul H., Justice (dissenting).

I respectfully dissent. I agree with the majority's conclusion that the record contains sufficient evidence to sustain appellant Jeffrey Silvernail's conviction. But I do not agree with the majority's conclusion that the district court's sua sponte act of locking the courtroom doors before the State's closing argument was "too trivial" to violate Silvernail's constitutional right to a public trial. On this issue, I would conclude that the district court's decision to close the courtroom constitutes reversible error and I would remand for a new trial.

The United States and Minnesota Constitutions guarantee a criminal defendant's right to a public trial. *See* U.S. Const. amend. VI; Minn. Const. art 1, § 6. The public trial right has a long and rich lineage that stretches back to the English common law and grew out of "[t]he traditional Anglo–American distrust for secret trials." *In re Oliver,* 333 U.S. 257, 268, 68 S.Ct. 499, 92 L.Ed. 682 (1948). As the United States Supreme Court has observed, the American aversion to secret trials "has been variously ascribed to the notorious use of this practice by the Spanish Inquisition, to the excesses of the English Court of Star Chamber, and to the French monarchy's abuse of the lettre de cachet." *Id.* at 268–69, 68 S.Ct. 499 (footnotes omitted). Our country's public trial guarantee reflects the founders' wisdom of the need to cast sunlight—the best of disinfectants—on criminal trials. *Cf.* Louis D. Brandeis, *Other People's Money and How the Bankers Use It* 92 (1914). In other words,

the public-trial guarantee embodies a view of human nature, true as a general rule, that judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings. A fair trial is the objective, and public trial is an institutional safeguard for attaining it.

*Estes v. Texas,* 381 U.S. 532, 588, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (Harlan, J., concurring) (citation omitted) (internal quotation marks omitted).

The Supreme Court has held that the right to a public trial right is so essential to the integrity of the criminal justice process that its violation falls into "a limited class of fundamental constitutional errors that 'defy analysis by harmless error standards.'" *Neder v. United States,* 527 U.S. 1, 7, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (quoting *Arizona v. Fulminante,* 499 U.S. 279, 309, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). As we have explained, "[e]rrors that are structural require automatic reversal because such errors call into question the very accuracy and reliability of the trial process." *State v. Everson,* 749 N.W.2d 340, 347 (Minn.2008) (citation omitted) (internal quotation marks omitted). Such "errors *always* invalidate a conviction whether or not a timely objection to the error was made." *Id.* at 347–48 (emphasis added) (citation omitted) (internal quotation marks omitted). We have repeatedly recognized that a violation of a criminal defendant's right to a public trial constitutes structural error. *See, e.g., State v. Bobo,* 770 N.W.2d 129, 139 (Minn. 2009).

Here, the district court closed and locked the courtroom doors for the duration of the State's closing argument. Before doing so, the court said:

been *insufficient* to prove the disputed element of identity.

I will state for the spectators in the courtroom, as a courtesy to everyone who is involved, if you're in the courtroom now, you're in the courtroom until there's a break. *If you're not in the courtroom now, which obviously they can't hear me if they weren't, they have to stay out until there is a break. Going in and out obviously creates some disruptions and distractions that—that we don't want to have.* So if you don't feel that you can stay here until a break, then now is the time for you to step out.

(Emphasis added.) The majority, without even looking at the court's underwhelming rationale for the closure—"[g]oing in and out obviously creates some disruptions and distractions"—summarily concludes that "the district court did not violate Silvernail's right to a public trial when it locked the courtroom doors during the State's closing argument." *Supra* at 12. I strongly disagree.

The closure at issue in this case fails to satisfy the standard established by the Supreme Court in *Waller v. Georgia*, 467 U.S. 39, 48, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). That standard applies in Minnesota. *See State v. Mahkuk*, 736 N.W.2d 675, 684–85 (Minn.2007) (adopting the *Waller* standard). Under *Waller*, before a judge may close the courtroom, (1) the party seeking closure must advance *an overriding interest* likely to be prejudiced; (2) the closure must be *no broader than necessary* to protect the overriding interest asserted; (3) the court *must consider reasonable alternatives* to closure; and (4) the court must make *adequate findings* to support the closure on the record. *Mahkuk*, 736 N.W.2d at 685 (citing *Waller*, 467 U.S. at 48, 104 S.Ct. 2210) (emphasis added). Here, not a single one of the *Waller* re-

quirements is met. No party advanced an overriding interest for the closure; the court deemed the closure necessary sua sponte. The court held no hearing on the closure, considered no alternatives to closure, and made no findings to support the closure. Accordingly, the district court's closure violated the *Waller* standard right across the board. Therefore, I would conclude that the court violated Silvernail's right to a public trial when it closed the courtroom during the State's closing argument.

In reaching the opposite conclusion, the majority relies on our recent decision in *State v. Brown*, 815 N.W.2d 609, 615–18 (Minn.2012). I joined the dissent in *Brown*, and the majority appropriately acknowledges my "forceful tone" when I address our decision in *Brown* and correctly notes that I "concede[ ] that *Brown* is binding" precedent. The majority also correctly observes that I continue to believe that *Brown* was wrongly decided and that "we should reconsider *Brown* and overrule it." *Supra* at 12 n. 1. That is why I write separately in the case before us today to underscore my continuing disagreement with *Brown* and my belief that it is incumbent upon our court to more vigorously enforce every citizen's fundamental right to a public trial. *Brown*, 815 N.W.2d at 622–27 (Meyer, J., dissenting).

Over the course of the past 2 years, I have become concerned about the increasing number of petitions for review that our court has received from defendants who claim that district courts across our State have closed courtrooms in violation of the defendants' constitutional rights. We have denied review in the vast majority of those cases.[1] For lack of a better term, I have

---

1. For example, during the 2011–12 term, we denied five petitions for review that challenged the district court's decision to close or

lock the courtroom doors during final jury instructions. *See State v. Perez–Martinez*, No. A11–2003, 2012 WL 5476112 (Minn.App.

come to refer to this recent phenomenon as "creeping courtroom closure." The closure of courtrooms during trial is a practice that has unquestionably begun to creep its way into the routine of many of Minnesota's criminal courts. My concern that our decision in *Brown* would result in such unwarranted closures appears to have been justified. That is why I believe we should reconsider and overrule *Brown.* It is not enough to admonish courts, as the majority does, to only lock the courtroom doors "carefully and sparingly" and to "expressly state why the court is locking the courtroom doors." *Supra* at 12 n. 2 (internal quotation marks omitted). The United States and Minnesota Constitutions demand more and we should meet that demand. Here, the only way that demand can be met is if we reverse Silvernail's conviction and remand for a new trial.

For the foregoing reasons, I respectfully dissent.

Nov. 13, 2012), *rev. denied,* (Minn. Jan. 29, 2013); *State v. Juma,* No. A11–2142, 2012 WL 4856158 (Minn.App. Oct. 15, 2012), *rev. denied on courtroom closure,* (Minn. Jan. 15, 2013); *State v. Irby,* 820 N.W.2d 30 (Minn.App.2012), *rev. denied on courtroom closure,* (Minn. Nov. 20, 2012); *State v. Cook,* No. A11–1332, 2012 WL 3263760 (Minn.App. Aug. 13, 2012), *rev. denied,* (Minn. Oct. 24, 2012); *State v. Thomas,* No. A11–1215, 2012 WL 3023335 (Minn.App. July 23, 2012), *rev. denied,* (Minn. Oct. 16, 2012).