*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1099**

State of Minnesota,
Respondent,

vs.

Paul Martin Hippler,
Appellant.

**Filed August 10, 2015
Affirmed
Hooten, Judge**

Ramsey County District Court
File No. 62-CR-13-6694

Lori Swanson, Attorney General, St. Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Adam E. Petras, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Davi E. Axelson, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Hooten, Presiding Judge; Halbrooks, Judge; and Reilly, Judge.

### U N P U B L I S H E D   O P I N I O N

**HOOTEN**, Judge

Appellant challenges his conviction of failure to register as a predatory offender, arguing that (1) the district court committed reversible error by failing to instruct the jury

that it must unanimously decide which failure-to-register violation he committed, and (2) the evidence was insufficient to prove that he knowingly violated the requirements of the registration statute. We affirm.

**FACTS**

In September 2013, appellant Paul Martin Hippler was charged with one count of failure to register as a predatory offender, with an alleged offense date of April 15 to May 21, 2013. A jury trial was held in February 2014. The parties stipulated that, during the alleged offense period, Hippler was required to register as a predatory offender. The following evidence was adduced at trial.

As part of his registration requirement, Hippler was required to fill out a change of information (COI) form any time he changed his primary address or secondary address. On April 15, 2013, Hippler completed a COI form, listing his primary address as a St. Paul address. Hippler also listed two secondary addresses on the form: the same St. Paul address and a Little Canada address. The start date for these new addresses was April 15, 2013.

Hippler's cousin, S.B., lived at the St. Paul address, which she described as a small "mother-in-law" basement apartment in a house. By April 2013, she had lived there for over three years. During the 2012–13 school year, S.B.'s brother stayed with her a few nights per week. At some point, S.B.'s landlord observed S.B.'s brother staying there and told S.B. that, while she could have overnight guests, her brother could not *live* there because he was not on the lease. Her landlord then had S.B. sign a letter indicating that

2

she was "the only one that lived there" and that nobody else could use the address as a mailing address. S.B. signed this letter shortly before Hippler began staying with her.

Prior to staying with S.B., Hippler asked her if he could use her address for registration purposes, and S.B. told him that he could not. S.B. explained to Hippler that she did not want to risk losing her apartment, given her landlord's recent warning. Hippler was disappointed but told her that he had other options for registering a primary address. She and Hippler also discussed the possibility of him registering as homeless, but he did not want to deal with the hassle of registering weekly. S.B. had "no problem with him coming to stay" on her couch "a couple nights a week" while he was between apartments, but she "stressed" to Hippler that he could not "live" there.

Hippler stayed at S.B.'s apartment only two nights: April 14 and 15, 2013. Hippler did not have a key to the apartment. S.B. let Hippler store some of his toiletries in her bathroom and some of his belongings in her garage, including clothes, duffle bags, suitcases, and a bed. The bed was not set up, and there was not enough room in the garage to have set it up. Hippler had access to the garage, as the service door was unlocked, but S.B. never gave him permission to live in the garage.

After Hippler stayed with S.B. for those two nights, "he just kind of disappeared for a couple of days." On April 19, S.B. sent Hippler a text message asking whether he was going to stay with her again. They exchanged text messages later that day, arguing about whether Hippler could use S.B.'s address for registration purposes, with S.B. again maintaining that he could not. In an April 23 text message, Hippler expressed frustration with S.B. for not paying back some money that she owed him and stated that he was

3

staying at motels. Communications then started to break down between the two. In a May 1 text message, Hippler called S.B. a "whore" and a "dumb b--ch." Later that day, S.B. called the police to report Hippler's harassing conduct, which included banging on her apartment door. On May 2, Hippler sent S.B. a text message telling her that he was living out of his car. He tried to persuade S.B. to let him live with her, but S.B. declined, indicating that she was scared of him. In a May 3 text message, Hippler asked S.B. if he needed her permission to get his belongings out of her garage because S.B. had locked the garage. In other text messages and voicemails, Hippler used a litany of profanities against S.B.

Later in May, Hippler became "aggressive" and started threatening S.B., and S.B. became fearful and tried to avoid him. Hippler followed her, swerved at her car, and broke off her car's antenna. S.B. called the police again to report Hippler's harassing and threatening behavior toward her. On May 17, S.B. petitioned for an order for protection (OFP) against Hippler, which was granted. On May 24, Hippler submitted a COI form indicating that he was homeless. But, between April 15 and May 23, Hippler's registered primary address was S.B.'s apartment. While Hippler was in custody pending trial in this case, he called his mother and asked her to pressure S.B. into telling police that he stayed with S.B. for two weeks.

Hippler testified in his own defense. He claimed that, prior to April 15, S.B. had agreed that he could stay with her "for two weeks, and then maybe longer, depending [on] how things worked out." He admitted that it was "a temporary arrangement." He also admitted that he knew he had to notify the authorities of a new primary address five

4

days prior to a primary address change. Hippler stated that, while he stayed in S.B.'s apartment for only two nights, he stayed in S.B.'s garage for several nights in late April, as well as at a motel. On cross-examination, he admitted that he had previously stayed in S.B.'s garage and was told by the authorities that he needed to register as homeless. He testified that from May 1 to May 21, he stayed in S.B.'s garage "most of the time" because his registered address was S.B.'s apartment. He claimed that he did not change his primary address earlier in May because he and S.B. "never talked about" whether or not he was welcome to stay with her.

During her closing argument, the prosecutor argued that Hippler provided false information on the April 15 COI form by stating that S.B.'s apartment was his primary address. The prosecutor alternatively argued that, even if S.B.'s apartment was his primary address on April 15, Hippler failed to immediately notify law enforcement once he no longer had that primary address. The prosecutor briefly mentioned the statute's requirement that a predatory offender must provide secondary addresses. During his closing argument, defense counsel argued that S.B.'s apartment was Hippler's primary address starting April 15 and that Hippler did not know he was unwelcome there until he was served with the OFP.

The district court instructed the jury that Hippler was guilty of the charged offense if he knowingly violated "any" of these three registration requirements within the charged time period:

> 1.  Providing the address of the person's primary residence with the law enforcement agency that has

jurisdiction in the area of the person's residence within 5 days before living at the new location; or

2.  Providing the address of all the person's secondary residence[s] in Minnesota . . . within 5 days before living at the new location; or

3.  Immediately informing the agent or authority that the primary address is no longer valid because of a change in circumstances.

The jury found Hippler guilty. The verdict form did not separately list the three alleged violations. Hippler was later sentenced, and this appeal followed.

## D E C I S I O N

## I.

Hippler argues that the district court committed reversible error by not giving the jury a specific-unanimity instruction, which would have ensured that the jury unanimously agreed on a particular violation of the registration statute. The district court gave the jury a standard-unanimity instruction: "In order for you to return a verdict, whether guilty or not guilty, each juror must agree with that verdict. Your verdict must be unanimous." Because Hippler's trial counsel did not object to this instruction or request a specific-unanimity instruction, we review for plain error affecting substantial rights. *State v. Kelley*, 855 N.W.2d 269, 273–74 (Minn. 2014). The three-pronged test for plain error requires Hippler to show that: (1) the district court committed error; (2) the error was plain; and (3) the plain error affected his substantial rights. *Id.* If all three prongs are met, we may correct the error "only if it seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 274 (quotations omitted).

6

In *State v. Wenthe*, which is controlling here, the supreme court did not address whether the district court's failure to give a specific-unanimity jury instruction was plain error because it determined that the alleged error did not affect appellant's substantial rights. ___ N.W.2d ___, ___, 2015 WL 3875366, at *4 (Minn. June 24, 2015). To establish that an erroneous jury instruction affected his or her substantial rights, an appellant "has the heavy burden of proving that there is a reasonable likelihood that giving the instruction in question had a significant effect on the jury verdict." *Kelley*, 855 N.W.2d at 283 (quotation omitted).

In *Wenthe*, appellant was a priest who was charged, in pertinent part, with one count of third-degree criminal sexual conduct for engaging in sexual penetration with the victim during a single meeting at which the victim had sought and received spiritual counsel. 2015 WL 3875366, at *2. At trial, the state introduced evidence as to the nature of the relationship between appellant and the victim, that sexual penetration had occurred on two specific dates, and that the two continued to have a sexual relationship for one year. *Id.* at *1–2. The jury found appellant guilty. *Id.* at *2. The supreme court affirmed Wenthe's conviction, stating that

> the unanimity instruction was prejudicial only if it is reasonably likely that (i) some jurors believed that both sexual penetration and spiritual counsel occurred at the November 13 meeting, but not at subsequent meetings; while (ii) other jurors believed that sexual penetration and spiritual counsel occurred at a later meeting but not at the November 13 meeting.

*Id.* at *4. The supreme court held that appellant was not prejudiced by the lack of a specific-unanimity instruction because there was "no reasonable possibility" that some

jurors could have concluded that both sexual penetration and spiritual counsel occurred at a later date but not on November 13 because the victim offered "detailed" evidence that both sexual penetration and spiritual counsel occurred on November 13, but did not offer such "detailed" evidence as to November 14 or any later date. *See id.* at *5–6.

Here, the state alleged that Hippler knowingly violated three provisions of the registration statute: (1) providing a primary address; (2) providing secondary addresses; and (3) immediately informing the authorities that his primary address was no longer valid. *See* Minn. Stat. § 243.166, subds. 3(b), 4a, 5(a) (2012). Hippler concedes that the first two violations comprised a single behavioral incident because they both allegedly occurred when he filled out the April 15 COI form. Therefore, the district court's standard-unanimity instruction was prejudicial only if it is "reasonably likely" that (i) some jurors believed that Hippler knowingly violated only the requirement of providing a primary address, while (ii) other jurors believed that Hippler violated only the requirement of immediately informing the authorities that his primary address was no longer valid. *See Wenthe*, 2015 WL 3875366, at *4.

Jurors could have reasonably concluded that Hippler knowingly violated the requirement of providing a primary address, but did not violate the later requirement of immediately informing the authorities that that primary address was no longer valid. S.B. clearly testified that she never agreed to let Hippler live at her apartment, although she did agree to let him periodically stay overnight there. This suggests that S.B.'s address could have been, at most, a valid secondary address, not a valid primary address. *See* Minn. Stat. § 243.166, subd. 1a(g) (2012) (defining primary address as "the mailing

8

address of the person's dwelling"); *see also id.*, subds. 1a(c) (defining dwelling as "the building where the person lives under a formal or informal agreement to do so"), 1a(i) (defining secondary address as "the mailing address of any place where the person regularly or occasionally stays overnight when not staying at the person's primary address"). It was also undisputed that Hippler did not register S.B.'s address five or more days before starting to live there, even though he was aware of that requirement. *See id.*, subd. 3(b) (requiring a registrant to register a new primary address "at least five days before the person starts living at" that address). If the jury concluded that Hippler knowingly violated the primary-address requirement, it would have no need to conclude that Hippler knowingly violated the requirement of immediately informing the authorities that he no longer had that primary address.

There is no reasonable possibility, however, that some jurors concluded that Hippler violated the notification requirement but not the primary-address requirement because most of the evidence at trial focused on whether he violated the primary-address requirement. The bulk of S.B.'s testimony was focused on the state's theory that there was no agreement between S.B. and Hippler for him to *live* at her apartment. The state's other witnesses similarly focused mostly on whether Hippler failed to register a primary address. Moreover, during her closing argument, the prosecutor primarily emphasized Hippler's failure to properly register a primary address, stating that this violation "is what this case is about." Because the vast majority of the state's evidence and argument focused on the primary-address violation, and because the notification violation was the

9

state's alternative theory of guilt, it is not reasonably likely that any juror believed that Hippler violated the notification requirement but not the primary-address requirement.

We conclude, consistent with the rationale in *Wenthe*, that it is not reasonably likely that the district court's failure to provide a specific-unanimity jury instruction significantly affected the verdict. While we agree with the state that Hippler's substantial rights were not affected as a result of the district court's failure to provide a specific-unanimity jury instruction, we note that the state could have taken steps to avoid this issue altogether. As was noted by the supreme court in *Wenthe*, "[t]he unanimity problems created by the [s]tate's vague drafting of the complaint could have easily been avoided by charging a separate count for each alleged [violation], narrowing the timeframe for the [offense], or electing a specific [violation] upon which it would rely to satisfy the . . . statute." *See* 2015 WL 3875366, at *4.

## II.

Hippler next argues that the evidence was insufficient to prove beyond a reasonable doubt that he knowingly violated the requirements of the registration statute. Under the penalty provision of the statute, "[a] person required to register under this section who knowingly violates any of its provisions or intentionally provides false information to a corrections agent, law enforcement authority, or the bureau is guilty of a felony." Minn. Stat. § 243.166, subd. 5(a). Because of how we resolved the specific-unanimity issue in part I, *supra*, we will address only whether the evidence was sufficient to prove that Hippler violated the statute's primary-address requirement.

10

"When considering a claim of insufficient evidence, this court conducts a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, is sufficient to allow the jurors to reach the verdict that they did." *State v. Nelson*, 812 N.W.2d 184, 187 (Minn. App. 2012) (quotation omitted). "We must assume that the jury believed the state's witnesses and disbelieved any evidence to the contrary." *Id.* (quotation omitted).

Hippler argues that the evidence is insufficient to prove that he violated the registration statute when he listed S.B.'s apartment as his primary address. We disagree. The registration statute provides that, "at least five days before the person starts living at a new primary address, . . . the person shall give written notice of the new primary address to the assigned corrections agent or to the law enforcement authority with which the person currently is registered." Minn. Stat. § 243.166, subd. 3(b); *see id.*, subd. 4a(a). Viewed in the light most favorable to the verdict, S.B.'s testimony shows that she agreed to let Hippler stay with her on a temporary basis, a few nights a week, until Hippler found a place to live. S.B. testified that, shortly before Hippler stayed with her for two days, her landlord warned her that nobody else could "live" in the unit with her. S.B. emphatically testified that she did not agree to let Hippler use her address for registration purposes, which undercuts his argument that there was an *agreement* for him to *live* there. True, Hippler moved some of his belongings into the garage and brought some toiletries into the apartment, but these actions were consistent with S.B.'s testimony that she agreed to let him stay at her apartment irregularly on a temporary basis.

11

Moreover, Hippler's argument that he had an informal agreement to live with S.B. renders the distinction between "primary address" and "secondary address" meaningless. A primary address is where "the person *lives* under a formal or informal *agreement* to do so." *See id.*, subd. 1a(c), (g) (emphasis added). A secondary address is "where the person *regularly or occasionally stays overnight* when not staying at the person's primary address." *Id.*, subd. 1a(i) (emphasis added). The evidence shows that, around April 14, 2013, S.B. agreed to let Hippler regularly or occasionally stay overnight at her apartment, but she did not agree to let Hippler live with her at her apartment. Moreover, the evidence shows that Hippler did not register S.B.'s apartment as his primary address five or more days before he began staying with S.B. Therefore, Hippler violated a provision of the registration statute when he gave S.B.'s address as his primary address in the April 15 COI form. *See id.*, subds. 3(b), 4a(a), 5(a).

The statute, however, also requires the state to prove that Hippler "knowingly" violated a provision of the registration statute. *Id.*, subd. 5(a). As a state of mind, knowledge "generally is proved circumstantially, by inference from words and acts of the actor both before and after the incident." *State v. Johnson*, 616 N.W.2d 720, 726 (Minn. 2000). "A conviction based on circumstantial evidence . . . warrants heightened scrutiny" compared to a conviction based on direct evidence. *State v. Al-Naseer*, 788 N.W.2d 469, 473 (Minn. 2010). This heightened scrutiny comes in the form of a two-step analysis. *State v. Silvernail*, 831 N.W.2d 594, 598 (Minn. 2013).

"The first step is to identify the circumstances proved." *Id.* "[I]n determining the circumstances proved, we consider only those circumstances that are consistent with the

12

verdict." *Id.* at 599. "As with direct evidence, we construe conflicting evidence in the light most favorable to the verdict and assume that the jury believed the [s]tate's witnesses and disbelieved the defense witnesses." *Id.* (quotation omitted). The circumstances proved are as follows. In April 2013, S.B. told Hippler that he could stay with her occasionally while he was between apartments, but he could not live there. S.B. told Hippler that he could not use her apartment as his primary address for registration purposes. Hippler stayed with S.B. only two nights.

"The second step is to determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *Id.* (quotations omitted). "Circumstantial evidence must form a complete chain that, as a whole, leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *State v. Hanson*, 800 N.W.2d 618, 622 (Minn. 2011). The circumstances proved are consistent with guilt because they indicate appellant knew that, while he could stay with S.B. occasionally, he did not have an informal agreement to live at S.B.'s apartment.

Hippler contends that "moving his belongings to [S.B.'s] address, listing it as his mailing address, and staying a few nights[] established an informal agreement for Hippler to live with [S.B.]" This argument is unpersuasive. As noted above, Hippler moving his personal property into S.B.'s garage was consistent with S.B. allowing Hippler to occasionally stay with her. Hippler's use of S.B.'s address for registration purposes against the strong wishes of S.B. does not indicate that there was an agreement for Hippler to live there. And, Hippler's staying two nights with S.B. is fully consistent with

13

S.B.'s agreement to let Hippler stay there occasionally. Hippler's alternative hypothesis is unreasonable and inconsistent with the circumstances proved.

We conclude that the circumstantial evidence as to Hippler's knowledge "form[s] a complete chain that, as a whole, leads so directly to the guilt of [Hippler] as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *Id.*

**Affirmed.**

14