*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-2334**

State of Minnesota,
Respondent,

vs.

Donald Ernest Beckman,
Appellant.

**Filed October 27, 2014
Affirmed
Stauber, Judge
Hooten, Judge, dissenting**

St. Louis County District Court
File No. 69HICR12809

Lori Swanson, Attorney General, St. Paul, Minnesota; and

James Andrew Borland, Hibbing City Attorney, Sellman Law Office, Hibbing, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Sean M. McGuire, Assistant State Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Stauber, Presiding Judge; Hooten, Judge; and Kirk, Judge.

**U N P U B L I S H E D   O P I N I O N**

**STAUBER**, Judge

On appeal from his convictions of misdemeanor criminal damage to property and disorderly conduct, appellant argues that (1) the evidence was insufficient to sustain his

convictions and (2) the district court erred by sentencing him for two offenses that occurred during a single behavioral incident. We affirm.

## FACTS

On September 10, 2012, appellant Donald Beckman went to the Hibbing Public Utilities (HPU) office to apply to have public utilities hooked up for his newly rented home. When he arrived at the HPU office, appellant, who is disabled and walks with a cane due to a lower-back injury, was informed that he needed to pay a $420 deposit to put the utilities in his name. Appellant then left the office, annoyed because he did not have sufficient funds on hand and because he was not informed beforehand of the deposit requirement.

After appellant left, Joseph Borra, a HPU employee, noticed that the outside door was not automatically closing. The doors are of heavy steel construction with double-pane glass. They are "handicap accessible," having a control arm that is connected to a motor. When the handicap-access button is pressed, the control arm operates an opening mechanism, and then a retraction mechanism when the door is closing. When the arm is not attached, the door will not open when the access button is pressed, requiring the person seeking entry to physically open the door. Once physically opened, the door will not automatically close.

Borra mentioned to a co-worker that, when appellant left the office, he broke the door. Borra then informed his supervisor of the situation. A police report was filed, and appellant was charged with disorderly conduct and criminal damage to property.

2

At trial, Borra testified that after being told of the required deposit, appellant "became upset with the amount" and began screaming and shouting obscenities. Borra also testified that appellant then left the building, pushing "excessively hard" on the door, causing the mechanism to break. Although Borra acknowledged that the doors "are somewhat hard to open," he testified that when appellant left, "there was a rapid rate of acceleration with the door, much faster than the average person leaving." Borra explained that "[t]ypically, when you leave the office the door only opens about two feet and most people skirt right around it. This time the door went beyond its opening point, and then actually the first one came snapping back and then the second one . . . just stayed open." Borra further testified that he "could visibly see that the hinge mechanism on the top [of the door] was separated." Finally, Borra could not recall having any problems with the door prior to appellant's visit.

Appellant testified that when he went to the HPU office on September 10, he pressed the handicap-access button that was supposed to open the external door. According to appellant, however, the door did not open. Appellant testified that he then pushed the button three or four more times, but it still would not open. Appellant further testified that he then used the handle of the door and physically opened it, which, because of his disability, was a difficult task.

Appellant testified that once inside the office, he talked with Borra, whom he recognized as somebody he knew of from high school. Appellant stated that when he was informed that he needed to pay a $420 deposit, he "was just annoyed that they didn't tell me I had to bring money or there was a deposit. Otherwise, I would have came

3

prepared." Appellant claimed that he called the deposit demand "ridiculous," and then walked away from the counter. According to appellant, he then had to push the door open and "prop it open with [his] cane, and then proceed to walk out." Appellant denied trying to break the door and did not "think" that he had damaged the door. And, although he could not testify with any certainty that he did not use a swear word when expressing his displeasure about the $420 deposit, he denied threatening anyone or attempting to pick a fight with anyone.

The jury found appellant guilty of both charged offenses. The district court then imposed concurrent 30-day sentences for both the disorderly conduct and the criminal damage to property offenses and stayed execution of those sentences. The court also imposed $500 fines for both offenses and ordered appellant to pay $269 in restitution for the criminal-damage-to-property offense. This appeal followed.

## D E C I S I O N

### I.

Appellant challenges his convictions of disorderly conduct and criminal damage to property, arguing that the evidence was insufficient to support his convictions. When reviewing the sufficiency of evidence to support a conviction, we conduct "a painstaking analysis of the record to determine whether the evidence, when viewed in the light most favorable to the conviction," is sufficient to allow jurors to reach a verdict of guilty. *State v. Ortega*, 813 N.W.2d 86, 100 (Minn. 2012) (quotation omitted). We assume that "the jury believed the state's witnesses and disbelieved any evidence to the contrary." *State v. Caldwell*, 803 N.W.2d 373, 384 (Minn. 2011) (quotation omitted). This court

"will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense." *Ortega*, 813 N.W.2d at 100.

## A.    Disorderly conduct

Minnesota law provides that whoever "engages in offensive, obscene, abusive, boisterous, or noisy conduct or in offensive, obscene, or abusive language tending reasonably to arouse alarm, anger, or resentment in others," in a "public or private place . . . knowing, or having reasonable grounds to know that it will, or will tend to, alarm, anger or disturb others or provoke an assault or breach of the peace, is guilty of disorderly conduct." Minn. Stat. § 609.72, subd. 1(3) (2012).

Disorderly conduct charges "must be closely scrutinized." *State v. Klimek*, 398 N.W.2d 41, 42 (Minn. App. 1986). "Whether particular conduct constitutes disorderly conduct depends on the facts and circumstances of each case." *Id.* at 43. Disorderly conduct must be conduct that will affect the peace and quiet of persons who may witness it and may be disturbed or driven to resentment by it. *State v. Reynolds*, 243 Minn. 196, 201, 66 N.W.2d 886, 890 (1954). When reviewing a conviction of disorderly conduct, a reviewing court must consider the defendant's words and conduct as a package. *Klimek*, 398 N.W.2d at 43.

Appellant argues that the record does "not support the conclusion that [he] engaged in offensive, obscene, abusive, boisterous, or noisy conduct, tending to reasonably arouse alarm, anger, or resentment in others." We disagree. Words that are

5

vulgar, offensive, or insulting may be criminal if they fall outside the protection afforded to speech by the First Amendment. *In re Welfare of S.L.J.*, 263 N.W.2d 412, 416 (Minn. 1978); *see also In re Welfare of M.A.H.*, 572 N.W.2d 752, 759-60 (Minn. App. 1997) (reversing disorderly conduct juvenile adjudication when juveniles swore loudly at police officers). Although "the disorderly conduct statute prohibits only 'fighting words' as applied to speech *content*, the disorderly shouting of otherwise protected speech or engaging in other 'boisterous or noisy *conduct*' may still trigger punishment under the statute without offending the First Amendment." *In re Welfare of T.L.S.*, 713 N.W.2d 877, 881 (Minn. App. 2006). Under those conditions, "it is not speech itself that triggers punishment; the statute may be applied to punish the manner of delivery of speech when the disorderly nature of the speech does not depend on its content." *Id.* Therefore, appellant's conviction may be upheld if his conduct was "offensive, obscene, abusive, boisterous, or noisy" and if he knew or had reason to know that his conduct would "tend to alarm, anger or disturb others." Minn. Stat. § 609.72, subd. 1(3).

Borra testified that, after being told of the required deposit, appellant "became upset with the amount" and began screaming and shouting obscenities. He also testified that when appellant left the building, he pushed "excessively hard" against the door. And, according to Borra, "everyone" in the office was "concern[ed]" and "took aware of what was going on" during appellant's outburst. If believed, Borra's testimony establishes that appellant knowingly engaged in abusive, boisterous, or noisy conduct that disturbed the people in the office. *See* Minn. Stat. § 609.72, subd. 1(3) (stating that a person is guilty of disorderly conduct if he "engages in . . . abusive, boisterous, or noisy

6

conduct" "knowing, or having reasonable grounds to know that it . . . will tend to, alarm, anger or disturb others"). The jury heard the evidence presented at trial and believed Borra's testimony, and we defer to the jury's determination of facts, assuming it believed the state's witnesses and rejected contrary evidence. *See State v. McDonald*, 394 N.W.2d 572, 576 (Minn. App. 1986) (stating that it is "exclusively within the province of the jury" to determine witness credibility and to give weight to their testimony), *review denied* (Minn. Nov. 26, 1986). Although we acknowledge that the evidence supporting the verdict was not particularly strong, we conclude that it was sufficient to sustain appellant's conviction of disorderly conduct.

**B.     Criminal damage to property**

Minnesota law also provides that "whoever intentionally causes damage to another person's physical property without the other person's consent" is guilty of a misdemeanor if the damage reduces the value of the property by no more than $500. Minn. Stat. § 609.595, subds. 2(a), 3 (2012).

"A conviction based on circumstantial evidence . . . warrants heightened scrutiny." *State v. Al-Naseer*, 788 N.W.2d 469, 473 (Minn. 2010). "Circumstantial evidence must form a complete chain that, in view of the evidence as a whole, leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *Id.* (quotation omitted). This court will not overturn a circumstantial-evidence conviction based on "mere conjecture." *Id.* Instead, a two-step analysis is applied when examining the sufficiency of circumstantial evidence. *State v. Silvernail*, 831 N.W.2d 594, 598-99 (Minn. 2013).

7

"The first step is to identify the circumstances proved. In identifying the circumstances proved, we defer to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the [s]tate." *Id.* (citation and quotation omitted). The jury "is in the best position to determine credibility and weigh the evidence." *Al-Naseer*, 788 N.W.2d at 473. Therefore, the circumstances proved are identified "in the light most favorable to the verdict." *State v. Pratt*, 813 N.W.2d 868, 874 (Minn. 2012).

Viewing evidence in the light most favorable to the verdict, the circumstances proved at trial are as follows: (1) appellant was upset when informed of the required deposit, and when he left the HPU office, he pushed "excessively hard" on the door; (2) after appellant left the office, Borra observed that the door was broken; (3) exhibits were admitted depicting the broken door with the hinge mechanism separated from the door; and (4) as Borra testified, although the door is typically "somewhat hard to open," there were no problems with the door prior to appellant coming into the office.

"The second step is to determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *Silvernail*, 831 N.W.2d at 599 (quotation omitted). In making this determination, this court does not "review each circumstance proved in isolation," but instead considers the circumstances on the whole. *State v. Andersen*, 784 N.W.2d 320, 332 (Minn. 2010). "The [s]tate does not have the burden of removing all doubt, but of removing all reasonable doubt." *Al-Naseer*, 788 N.W.2d at 473. This court independently examines the reasonableness of the possible inferences and gives "no deference to the fact finder's choice between

8

reasonable inferences." *Id.* at 473-74. To ensure that there is no reasonable doubt as to the defendant's guilt, there must be no reasonable inference inconsistent with guilt. *Id.* at 474.

Appellant argues that in light of his disability and his testimony that the door was broken when he entered the HPU office, it was only reasonable to infer that he did not break the door. But, the jury heard Borra's testimony that the door was not broken prior to appellant arriving at the office. And Borra testified that when appellant left, he pushed the door "excessively hard" by leaning into it with his full body weight and that the door was broken after appellant left the building. The jury was free to credit this testimony. Moreover, although appellant testified that the door was already broken when he arrived at the HPU office, the jurors clearly did not believe his testimony because the jury convicted him of criminal damage to property. *See Andersen*, 784 N.W.2d at 329 (stating that in determining the circumstances proved, "we defer, consistent with our standard of review, to the jury, acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the state" (quotation omitted)).

Appellant further argues that the "circumstances proved do not inexorably lead to the conclusion that [he] specifically intended to damage the door." But "[i]ntent may be proved by circumstantial evidence including the defendant's conduct" and "may be inferred from events occurring before and after the crime." *Davis v. State*, 595 N.W.2d 520, 525-26 (Minn. 1999). The record here reflects that appellant was upset about the required deposit and displayed his displeasure by shouting and yelling obscenities and

9

then pushing "excessively hard" on the door. From this evidence, the jury could infer that appellant intended to break the door. Therefore, we conclude that the evidentiary standard was met to prove by circumstantial evidence that appellant committed the crime of criminal damage to property.

## II.

Minn. Stat. § 609.035, subd. 1 (2012), provides that a person whose conduct "constitutes more than one offense" may be punished for only one of them. The test is whether the offenses are part of "a single behavioral incident." *Effinger v. State*, 380 N.W.2d 483, 488 (Minn. 1986). "The state has the burden to establish by a preponderance of the evidence that the conduct underlying the offenses did not occur as part of a single behavioral incident." *State v. Williams*, 608 N.W.2d 837, 841-42 (Minn. 2000).

"In order to determine whether two intentional crimes are part of a single behavioral incident, [courts] consider factors of time and place and whether the segment of conduct involved was motivated by an effort to obtain a single criminal objective." *State v. Bauer*, 792 N.W.2d 825, 828 (Minn. 2011) (quotation omitted). "Whether multiple offenses arose out of a single behavior[al] incident depends on the facts and circumstances of the particular case." *State v. Bookwalter*, 541 N.W.2d 290, 294 (Minn. 1995). But once "the facts are established, the determination [whether offenses arose from the same behavioral incident] is a question of law subject to de novo review." *State v. Marchbanks*, 632 N.W.2d 725, 731 (Minn. App. 2001). Failure to raise the issue of

10

multiple sentences arising from a single behavioral incident at sentencing does not preclude relief on appeal. *Ture v. State*, 353 N.W.2d 518, 523 (Minn. 1984).

Appellant argues that the district court erred by sentencing him for disorderly conduct and criminal damage to property because the offenses were committed during a single behavioral incident. We disagree. Disorderly conduct and criminal damage to property do not involve the same motivation. *See Bauer*, 792 N.W.2d at 828 (discussing determination of whether two intentional crimes are part of same behavioral incident). Criminal damage to property is a specific-intent crime requiring the offender to have intent to cause damage to another person's physical property without their consent. Minn. Stat. § 609.595, subd. 2(a). In contrast, disorderly conduct is a general intent crime requiring that the offender to know or have reasonable grounds to know that the behavior "will, or will tend to, alarm, anger or disturb others." Minn. Stat. § 609.72, subd. 1(3).

Appellant was convicted of disorderly conduct for engaging in abusive or boisterous behavior that tended to alarm the employees at the HPU office and was convicted of criminal damage to property for intentionally breaking the door. These acts were motivated by separate criminal objectives. Accordingly, the offenses are not part of a single behavioral incident.

**Affirmed.**

11

**HOOTEN**, Judge (dissenting)

I respectfully dissent. Based on the evidence produced at trial, appellant is correct in asserting that there was insufficient evidence to convict him of either disorderly conduct or criminal damage to property.

## I.

The majority acknowledges that "the evidence supporting the [disorderly conduct] verdict was not particularly strong," but is mistaken in then concluding that this evidence was sufficient to convict appellant of disorderly conduct. The state was required at trial to prove beyond a reasonable doubt that appellant: (1) "engage[d] in offensive, obscene, abusive, boisterous, or noisy conduct or in offensive, obscene, or abusive language tending reasonably to arouse alarm, anger, or resentment in others"; (2) "kn[ew], or ha[d] reasonable grounds to know that it will, or will tend to, alarm, anger, or disturb others or provoke an assault or breach of the peace"; and (3) did so in a public or private place. Minn. Stat. § 609.72, subd. 1 (2012).

As alluded to by the majority, appellant's speech while at the Hibbing Public Utilities (HPU) office, although unclear from the record, is protected by the First Amendment. To preserve the disorderly conduct statute's constitutionality, the supreme court has narrowly construed the "offensive, obscene, or abusive language" portion of the statute to only apply to "fighting words" when used to punish speech. *In re Welfare of S.L.J.*, 263 N.W.2d 412, 418–19 (Minn. 1978). "Fighting words" are "vulgar, offensive, insulting words [that] would tend to incite an immediate breach of the peace," or words that would "have an immediate tendency to provoke retaliatory violence or tumultuous

D-1

conduct by those to whom such words are addressed." *Id.* at 419 (quotation omitted). Whether certain language rises to the level of fighting words depends on the facts and circumstances of the case. *State v. Lynch*, 392 N.W.2d 700, 704 (Minn. App. 1986).

According to the service clerk at HPU, appellant's reaction upon learning a substantial deposit was required before he could set up new service was "screaming and hollering" that included "a bunch of" unspecified obscenities. The clerk was unable to recall exactly what words or obscenities were used, and only testified that appellant's statements were "curse words" and referred to "scams." On cross-examination, the clerk further testified that appellant did not threaten him personally, call him names, or try to start a fight with him. Without more evidence in the record as to what appellant's words were, there is no showing that the speech could have provoked a breach of the peace or retaliatory violence. In *S.L.J.*, a 14-year-old defendant's statement of "f*** you, pigs" to police officers sitting in a squad car was not considered fighting words. 263 N.W.2d at 415. After providing its narrow construction of the disorderly conduct statute, the court said:

> While it is true that no ordered society would condone the vulgar language used by this 14-year-old child, and . . . her words were intended to, and did, arouse resentment in the officers, *the constitution requires more before a person can be convicted for mere speech.*

*Id.* at 419–20 (emphasis added). In *Lynch*, we held that similar language *was* fighting words due to an additional circumstance: the defendant was using the speech to incite a club-brandishing crowd. 392 N.W.2d at 704–05. Even if what appellant said was as vulgar and offensive in nature as the speech in *S.L.J.* or *Lynch*, the circumstances do not

D-2

indicate that those words had the potential to cause violence or a breach of the peace that was dispositive in *Lynch*.

The majority is correct that *In re Welfare of T.L.S.* held that the disorderly conduct statute can punish the manner of speech and other accompanying conduct, even if the speech itself is protected by the First Amendment, so long as the "disorderly nature of the speech does not depend on its content." 713 N.W.2d 877, 881 (Minn. App. 2006). In *T.L.S.*, the defendant was "shrieking" obscenities at a police officer, and the noise was so loud that it was "disruptive to the running of the school and purposes of the school." *Id.* at 879. This court held that her speech itself was protected by the First Amendment, but her "boisterous and noisy *conduct*" in making that speech was punishable under the disorderly conduct statute. *Id.* at 880. Similarly, the defendant in *State v. Klimek* could be punished under the statute due to the threatening conduct that accompanied his words—following a guardian ad litem out to her car and shaking his fist at her. 398 N.W.2d 41, 43 (Minn. App. 1986).

But looking beyond appellant's words, the conduct proved at trial simply does not constitute "offensive, obscene, abusive, boisterous, or noisy conduct" that "tend[ed] reasonably to arouse alarm, anger, or resentment in others." Minn. Stat. § 609.72, subd. 1(3). The evidence provides two instances of conduct during the ten-minute period appellant was at the HPU office for which he might be punished: his "screaming and

hollering" at the clerk and his "excessively hard" pushing of the office doors.[1]  But the evidence does not show that this conduct aroused alarm, anger, or resentment in those present at the HPU.   The following exchange at trial illustrates the effect appellant's conduct had on the four utility workers who were present:

> PROSECUTOR: Is this typical for the service employees of the [u]tility to be addressed like this?
>
> CLERK: *It happens more often than I would like.*
>
> PROSECUTOR: But it's not a typical everyday occurrence, like, oh, it's just another happy customer or unhappy customer?
>
> CLERK: No, it's not typical.
>
> PROSECUTOR: Cause some concern with regard to the individuals and yourself there?
>
> CLERK: Yes, everyone took [sic] aware of what was going on.

(emphasis added).   This evidence, provided by the state's chief witness on direct examination, showed the employees were merely "aware" of appellant's outburst, and it was customer conduct that, while atypical, was not so disturbing as to *alarm* utility employees who had seen this type of conduct before.  Similarly, the clerk's reaction after seeing appellant push open the door "excessively hard" and noticing that the door remained open was to comment to a fellow employee, "I think he just broke our door," and then later call the police after speaking with a supervisor.  This is a far cry from the

---

[1] At closing arguments, the state also alleged that appellant had snatched his belongings off the HPU counter. As pointed out in appellant's brief, this fact was not in evidence at trial.

classroom disruption caused by the "shrieking" in *T.L.S.* or the fear resulting from threatening actions in *Klimek*. The evidence here fails to show a similar disturbance of the peace.

"Not every annoyance is born of culpable conduct." *State v. Korich*, 219 Minn. 268, 271, 17 N.W.2d 497, 498 (Minn. 1945). We have warned before that the disorderly-conduct statute "should not be used to combat rudeness or [as] social engineering." *Klimek*, 398 N.W.2d at 43. Even assuming the jury believed the state's witnesses, and viewing the evidence in the light most favorable to the conviction, *see State v. Ortega*, 813 N.W.2d 86, 100 (Minn. 2012), the evidence is insufficient for a reasonable juror to conclude beyond a reasonable doubt that appellant's conduct "tend[ed] reasonably to arouse alarm, anger, or resentment" as required for a guilty verdict. *See* Minn. Stat. § 609.72, subd. 1(3).

## II.

To convict appellant of criminal damage to property, the state had to prove beyond a reasonable doubt, inter alia: (1) that appellant broke the door; and (2) that appellant intended to break the door. *See* Minn. Stat. § 609.595, subd. 2(a) (2012) (providing that "whoever *intentionally* causes damage to another person's physical property without the other person's consent" is guilty of an offense (emphasis added)). I agree with the majority that the state proved beyond a reasonable doubt that when appellant went through the door, it broke. But I disagree with the majority's conclusion that the state proved beyond a reasonable doubt that appellant intended to break the door because, as to the circumstantial evidence of appellant's state of mind, "the circumstances proved in this

D-5

case are consistent with a reasonable inference of innocence." *State v. Al-Naseer*, 788 N.W.2d 469, 480 (Minn. 2010).

Due to the use of the term "intentionally" in the criminal damage to property statute, criminal intent is a required element of the offense. *See* Minn. Stat. § 609.02, subd. 9(1) (2012). Under Minnesota's criminal code, a criminal offense that is defined using the word "intentionally" requires that the defendant either: (1) "has a purpose to do the thing or cause the result specified"; or (2) "believes that the act . . . , if successful, will cause that result." *Id.* subd. 9(3). A criminal damage to property charge under Minn. Stat. § 609.595 therefore requires proof that the defendant purposely caused damage to another's property without consent, or proof that the defendant believed his or her act would cause such damage. In addition, "the actor must have knowledge of those facts which are necessary to make the actor's conduct criminal and which are set forth after the word 'intentionally.'" Minn. Stat. § 609.02, subd. 9(3).

As a state of mind, intent "generally is proved circumstantially, by inference from words and acts of the actor both before and after the incident. A jury is permitted to infer that a person intends the natural and probable consequences of [his or her] actions." *State v. Johnson*, 616 N.W.2d 720, 726 (Minn. 2000) (citation omitted). "A conviction based on circumstantial evidence . . . warrants heightened scrutiny." *Al-Naseer*, 788 N.W.2d at 473. This heightened scrutiny comes in the form of a two-step process when reviewing sufficiency-of-the-evidence challenges based on circumstantial evidence. "The first step is to identify the circumstances proved," and "[t]he second step is to determine whether the circumstances proved are consistent with guilt and inconsistent with any rational

hypothesis except that of guilt." *State v. Silvernail*, 831 N.W.2d 594, 598–99 (Minn. 2013) (quotations omitted).

"[I]n determining the circumstances proved, we consider only those circumstances that are consistent with the verdict." *Id.* at 599. "As with direct evidence, we construe conflicting evidence in the light most favorable to the verdict and assume that the jury believed the [s]tate's witnesses and disbelieved the defense witnesses." *Id.* (quotation omitted). Here, the relevant circumstances proved are as follows. Appellant's undisputed testimony was that he suffers from a chronic lower-back injury and used a cane while visiting the HPU on September 10, 2012. Due to his condition, appellant typically has to balance doors with his cane or elbow in order to fully open them, and he did brace the door with his elbow when entering HPU. While at the HPU, appellant became upset when informed of the required deposit and expressed his displeasure by "scream[ing] and holler[ing]." When he left the office, the clerk observed that appellant pushed "excessively hard" on both doors by "lean[ing] into [the doors] and just with body weight push[ing] [them] forward." The HPU office had inner and outer handicap-accessible doors made of heavy steel and double-paned glass. According to the clerk, the state's chief witness at trial, these doors were "difficult to open at times" such that "[m]ost people have to lean on them to push them open," and the doors would "only open[] about two feet and most people [would] skirt right around [them]." Upon leaving the HPU office, appellant went through the first, inner door by pushing "excessively hard," and when he similarly pushed open the second, outer door, it "just stayed open" because the return mechanism arm on the door frame was disconnected from the outer

door itself. The return mechanism was originally attached to the outer door with two screws, but only one screw was found at the scene by the investigating police officer. A citation for disorderly conduct and criminal damage to property against appellant was published in the local newspaper, and after seeing the publication, appellant called the police because he thought his identity had been stolen.

After establishing the circumstances proved, "[t]he second step is to determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *Id.* at 599 (quotations omitted). "Circumstantial evidence must form a complete chain that, as a whole, leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *State v. Hanson*, 800 N.W.2d 618, 622 (Minn. 2011) (citing *Al-Naseer*, 788 N.W.2d at 473). The state need not remove all doubt, but it has the burden of removing all reasonable doubt. *Id.* We give no deference to the jury's choice between reasonable inferences. *Al-Naseer*, 788 N.W.2d at 474.

The majority is correct that the circumstances proved are arguably consistent with an inference of guilt: that appellant intended to damage the door. However, the heightened review of circumstantial evidence entails more than "simply" examining "whether the inferences that point to guilt are reasonable." *Silvernail*, 831 N.W.2d at 599. The circumstances must also be "inconsistent with any rational hypothesis *except that of guilt.*" *Id.* (quotation omitted) (emphasis added). The majority utterly fails to show how the evidence produced at trial sufficiently excludes alternate hypotheses consistent with appellant's innocence. The inference that appellant intended to damage

the outer door at the HPU office is not the only reasonable inference that can be drawn from the circumstances proved, and therefore appellant's conviction for criminal damage to property cannot be upheld.

In the context of criminal damage to property charges, intent can be inferred from conduct. *See State v. Anderson*, 494 N.W.2d 876, 876 (Minn. 1993) (order opinion); *Barnslater v. State*, 805 N.W.2d 910, 915 (Minn. App. 2011). In *Anderson* and *Barnslater*, the defendants damaged property by throwing it either into a lake, *Anderson*, 494 N.W.2d at 876, or around a house, *Barnslater*, 805 N.W.2d at 915. An inference of a defendant's intent to damage property based on evidence that the defendant threw an object is supported by the fact that throwing is an action that a reasonable person knows will likely result in damage to the property; in other words, damage is the "natural and probable consequenc[e]" of such an action. *Johnson*, 616 N.W.2d at 726; *see also Anderson*, 494 N.W.2d at 876.

Appellant did appear to push "excessively hard" on the door, and the door was broken after he left the HPU office. But appellant's conduct here was not *intrinsically* damaging. A radio is not thrown into a lake in the normal course of using that property, *see Anderson*, 494 N.W.2d at 876, but doors are pushed and pulled in the normal course of their operation. The degree of force applied by appellant may have looked "excessive" to the clerk, but the clerk also testified that appellant appeared to apply the same level of force to the inner door that did not break. Beyond the simple cause-and-effect logic that the door was not broken until appellant pushed it open, and the clerk's testimony that the pushing appeared "excessive," there is no evidence in the record supporting the

D-9

conclusion that the "natural and probable" consequence of appellant's actions was a broken door. *Johnson*, 616 N.W.2d at 726.

Other reasonable inferences can be drawn from appellant's opening of the HPU office door. One reasonable inference is that appellant's conduct in opening the door "excessively hard" was due to his disability and the nature of the door. The evidence establishes appellant's disability, including his use of a cane and the fact that the outer door was difficult to open and possibly already in a compromised condition due to a missing screw. While appellant may have been upset at the utility clerk before opening the door, it is reasonable to infer that his outburst had no bearing on his later "excessively hard" pushing on the door. Instead, appellant may have pushed "excessively hard" due to his disability and the fact that the door was inherently difficult to open. But, even assuming that appellant was still upset when he left the HPU office, it could also reasonably be inferred that he pushed excessively hard on the outer door not with the intent to break it, but instead to further express frustration at having to pay the HPU $420 before he could receive electrical service. It is reasonable to infer that he then opened the doors "excessively hard" not with the intent to damage the doors, but because he was still upset about having to pay an unforeseen utility bill. In either of these scenarios, appellant nonetheless lacks the necessary criminal intent to damage the door.

An additional circumstance supports both of these alternative hypotheses: appellant's actions after he left the HPU office. As noted by the majority, a defendant's actions after the alleged offense can serve as evidence of intent. *Davis v. State*, 595 N.W.2d 520, 526 (Minn. 1999) ("[I]ntent may be inferred from events occurring before

and after the crime."); *see also State v. Yang*, 774 N.W.2d 539, 562 (Minn. 2009) (holding that defendant's fleeing the scene and failing to render aid to the victim were evidence of intent to kill). Here, when he read the publication noticing the citations, appellant thought his identity had been stolen and contacted the police with a complaint that someone using his name had been cited for disorderly conduct and criminal damage to property. Appellant's conduct after the incident at the HPU fails to show that he was even aware he had broken the door, much less that he intended to do so. This circumstance is wholly consistent with the alternate hypotheses that appellant lacked intent to damage the door, and it is difficult to see how one could infer intent in light of appellant's actions after the incident.

When viewed as a whole, the circumstances proved are consistent with other reasonable hypotheses that show a lack of criminal intent. "[I]f any one or more circumstances found proved are inconsistent with guilt, or consistent with innocence, then a reasonable doubt as to guilt arises." *Al-Naseer*, 788 N.W.2d at 474 (quotations omitted). The circumstances proved at trial do not form the "complete chain" needed to show intent beyond a reasonable doubt because they fail to exclude other reasonable inferences showing a lack of intent. Therefore, the evidence in the record is insufficient to establish appellant's guilt beyond a reasonable doubt.

Because the evidence presented at trial is insufficient to support appellant's convictions for criminal damage to property and disorderly conduct, I would reverse.