*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0607**


State of Minnesota,
Respondent,

vs.

Daniel Barenburg,
Appellant.


**Filed April 4, 2016
Affirmed in part and reversed in part
Bjorkman, Judge**


Sherburne County District Court
File No. 71-CR-14-995

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Kathleen A. Heaney, Sherburne County Attorney, Leah G. Emmans, Assistant County Attorney, Elk River, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Anders J. Erickson, Assistant Public Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Halbrooks, Presiding Judge; Bjorkman, Judge; and

Kalitowski, Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**BJORKMAN**, Judge

Appellant challenges the sufficiency of the evidence supporting his convictions of making terroristic threats and making a 911 call while knowing that no emergency exists. We affirm in part and reverse in part.

## FACTS

On July 20, 2014, at approximately 7:10 a.m., Sherburne County Sheriff's Deputy Scott Anderson was dispatched to appellant Daniel Barenburg's residence after Barenburg reported that his neighbor's surveillance camera was pointed at his residence and invading his privacy. Deputy Anderson determined that the camera was not pointed at Barenburg's residence and left.

Deputy Anderson returned around 12:40 p.m. after Barenburg's neighbor reported that flowers had been thrown at the end of his driveway. Deputy Anderson spoke with Barenburg's mother, who said that her son would not come to the door, was thinking of hurting himself, and had a shotgun. Deputy Anderson also received notification that Barenburg had threatened his neighbor. Deputy Anderson took a recorded statement from the neighbor, who reported that Barenburg told him, "Get the f-ck outta here, you better leave before I change my mind," and "If you don't leave, you're gonna end up dead." The neighbor expressed fear for his family's safety because he believed Barenburg was serious and had a gun.

Between 1:53 p.m. and 3:51 p.m., Barenburg made numerous 911 calls. During the first nine calls, Barenburg repeatedly asked why his mother had been in the back of a squad

car. In several of these calls, he made offensive and vulgar remarks to the dispatchers, including that he would like to speak to a "man not a b-tch," and "you should just go f-cken go home and kill yourself." He did not report any emergencies.

A dispatcher transferred Barenburg's ninth call to Deputy Anderson. Barenburg again asked why his mother had been in the back of a squad car. Deputy Anderson explained that his mother felt more comfortable speaking with him in the car. Barenburg told Deputy Anderson that he had a shotgun and wanted officers to shoot him. Barenburg was also agitated because he saw Deputy Anderson's squad car, so Deputy Anderson eventually left the scene.

At approximately 3:52 p.m., Barenburg told a dispatcher, "If you don't send someone here or very, very soon I'm gonna kill a neighbor and then I'm gonna kill myself." He then hung up. Deputy Anderson and another member of the sheriff's department returned to the scene. Sergeant Frank arrived first, and saw Barenburg walking away from his front door toward his neighbor's house. Barenburg was holding what appeared to be a long, black gun. When Barenburg saw Sergeant Frank, he returned to his house, put the gun down, and sat down outside the front door. The deputies tried to convince Barenburg to walk peacefully toward the squad car, to no avail. Eventually, Barenburg picked the gun up and went back inside his house. The commanding deputy then requested that the emergency response unit (ERU) come to the scene.

Investigator Luke McLean acted as crisis negotiator for the ERU. He first attempted to contact Barenburg at 5:56 p.m., but was unsuccessful. Over the next three hours, Investigator McLean called Barenburg 35 times. Barenburg repeated that he wanted the

3

police to come to his house and shoot him. He continued to complain about his neighbors and became agitated on several occasions. Eventually, the ERU decided to cut off the power to the residence. Investigator McLean then used a PA system to speak with Barenburg for approximately 15 minutes. At approximately 9:20 p.m., Barenburg left the house and was taken into custody. Deputies first took him to a hospital for evaluation and then to jail.

Respondent State of Minnesota charged Barenburg with making terroristic threats, making a 911 call while knowing that no emergency existed, and attempted second-degree assault. Pursuant to Minn. R. Crim. P. 26.01, subd. 3, the parties submitted the case to the district court for trial based on stipulated facts. The district court found Barenburg guilty of the first two charges, but not guilty of attempted second-degree assault. Barenburg appeals.

## DECISION

"In reviewing a sufficiency of the evidence challenge, we review the record in the light most favorable to the conviction to determine whether the evidence reasonably could have permitted the [decision-maker] to convict." *State v. Henderson*, 620 N.W.2d 688, 704-05 (Minn. 2001). When a conviction is based on circumstantial evidence, we use a two-step process. *State v. Silvernail*, 831 N.W.2d 594, 598 (Minn. 2013). First, we identify the circumstances proved, assuming that the fact-finder resolved any factual disputes in a manner that is consistent with the verdict. *Id.* at 598-99. Second, we independently examine the reasonableness of the inferences the fact-finder could draw from those circumstances. *Id.* at 599. All circumstances proved must be consistent with guilt and

4

inconsistent with any rational hypothesis except that of guilt. *State v. Andersen*, 784 N.W.2d 320, 329 (Minn. 2010).

**I.**     **The evidence is sufficient to support Barenburg's terroristic-threats conviction.**

To establish Barenburg made terroristic threats, the state had to prove: (1) he threatened, directly or indirectly, (2) to commit a crime of violence, (3) with the purpose to terrorize another or in reckless disregard of the risk of terrorizing another. Minn. Stat. § 609.713, subd. 1 (2012). Intent is a state of mind that is generally proved circumstantially based on inferences drawn from the defendant's words and actions in light of the totality of the circumstances. *State v. Smith*, 825 N.W.2d 131, 136 (Minn. App. 2012), *review denied* (Minn. Mar. 19, 2013). And "a person who might lack a specific intent to threaten or terrorize may nevertheless utter an objectively threatening statement recklessly, committing a terroristic-threats crime." *State v. Bjergum*, 771 N.W.2d 53, 57 (Minn. App. 2009), *review denied* (Minn. Nov. 17, 2009).

Barenburg concedes that the evidence established that he told his neighbor, "If you don't leave, you're gonna end up dead" and later told the dispatcher, "If you don't send someone here or very, very soon I'm gonna kill a neighbor and then I'm gonna kill myself." Accordingly, the only issue is whether the state proved the intent element of the offense. Barenburg argues that the circumstances proved are not inconsistent with the rational hypothesis that he made the statements "without understanding there was a substantial and unjustifiable risk that his statements would cause terror." We are not persuaded. Barenburg's argument is premised on his assertion that he made the threatening statements

5

solely to induce the police to come to his house and shoot him or have the police watch him kill himself. But to induce the police to respond to the threats, Barenburg would necessarily intend that they be taken seriously. And after he repeated the threat to the 911 dispatcher, he left his house with a gun and walked toward his neighbor's house. Because Barenburg's goal was to elicit a response from law enforcement, it is not rational to conclude that he lacked knowledge that his statements would cause terror or that he did not appreciate the substantial risk that his statements would have that effect.

Moreover, the record does not support Barenburg's argument that it was clear that "his only intent was to commit suicide." Barenburg first threatened his neighbor; nothing in the record indicates that he told his neighbor he intended to commit suicide. And the neighbor specifically stated that he felted threatened by Barenburg's remarks. *See State v. Schweppe*, 306 Minn. 395, 401, 237 N.W.2d 609, 614 (1975) (stating that a victim's reaction is circumstantial evidence relevant to the defendant's intent in making the threatening statement).

In sum, the circumstances proved are inconsistent with any rational hypothesis except that Barenburg made the threatening statements with the intent to terrorize another, or in reckless disregard of the risk. We therefore conclude that the evidence is sufficient to support Barenburg's conviction of making terroristic threats.

## II. The evidence is insufficient to support Barenburg's conviction of making a 911 call while knowing there was no emergency.

An individual commits a misdemeanor when he "makes or initiates an emergency call, knowing that no emergency exists, and with the intent to disrupt, interfere with, or

6

reduce the provision of emergency services or the emergency call center's resources, remains silent, or makes abusive or harassing statements to the call recipient." Minn. Stat. § 609.78, subd. 1(6) (Supp. 2013). To establish the knowledge element of the offense, the state had to prove that Barenburg believed that an emergency did not exist when he made the 911 calls. *See* Minn. Stat. § 609.02, subd. 9(1)-(2) (2012) (stating that when a statute includes criminal intent as an element, the use of some form of the verb "know" requires "that the actor believes that the specified fact exists").

Barenburg argues that the circumstances proved are consistent with the rational hypothesis that he called 911 because of the emergency created by his suicidal intent. We agree. In finding that Barenburg knew there was no emergency when he made the 911 calls, the district court focused on the fact that some of Barenburg's calls consisted of only vulgar remarks to the dispatchers. But consideration of the evidence as a whole demonstrates Barenburg called 911 in response to his mental distress and suicidal thoughts.

Barenburg's mother was concerned that Barenburg was going to hurt himself before he began making the 911 calls. Barenburg then started calling 911, and in his first conversation after being connected with Deputy Anderson, said that he wanted the police to shoot him. From that point on, Barenburg made repeated statements over the course of five and a half hours about wanting to die and wanting the police to shoot him.

Moreover, law-enforcement records reflect concern that Barenburg might commit suicide. Crisis negotiator McLean's narrative report indicates that the dispatcher advised him of "a possible suicidal individual." McLean's general description of his interactions with Barenburg states that "[Barenburg] was highly aggressive throughout the

7

conversations that I had with him and he wanted law enforcement to come into his household and kill him. I attempted to reason with Barenburg but he was unable to control his emotions." The transcripts of the earlier 911 calls similarly show that Barenburg was aggressive and emotionally distressed. While it is true that Barenburg may not have expressly reported an emergency during the calls, his demeanor and statements reflected the mental-health emergency Barenburg himself was experiencing. Nothing in Minn. Stat. § 609.78, subd. 1(6) excludes emergencies caused by the caller's mental health or requires that the call be based on an emergency situation facing someone other than the caller. The record shows that Barenburg's mental distress prompted all of his interactions with the 911 dispatchers and police. His clearly demonstrated distress was the emergency to which law enforcement appropriately responded.

Because the circumstances proved are consistent with a rational hypothesis other than guilt, the evidence is insufficient to support Barenburg's conviction of making a 911 call while knowing that no emergency exists. Accordingly, we reverse this conviction.

**Affirmed in part and reversed in part.**