*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A25-0160**

State of Minnesota,
Respondent,

vs.

Ler Htoo Hshee,
Appellant.

**Filed February 9, 2026**
**Affirmed in part, reversed in part, and remanded**
**Smith, Tracy M., Judge**

Lyon County District Court
File No. 42-CR-23-1336

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Abby Wikelius, Lyon County Attorney, Julianna F. Passe, Assistant Lyon County Attorney, Marshall, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Andrea Barts, Assistant Public Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Smith, Tracy M., Presiding Judge; Harris, Judge; and

Florey, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**SMITH, TRACY M.**, Judge

Appellant Ler Htoo Hshee appeals from the judgment of conviction for third-degree assault, arguing (1) that respondent State of Minnesota did not prove beyond a reasonable doubt that he acted intentionally to cause bodily harm[1] and (2) in the alternative, that the district court erred in calculating his criminal-history score by including out-of-state convictions. Because the evidence is sufficient to prove that Hshee intentionally acted to cause bodily harm to the victim, we affirm the third-degree assault conviction. But because the record does not support the inclusion of the out-of-state convictions in Hshee's criminal-history score, we reverse his sentence and remand for resentencing. Because Hshee did not object to the criminal-history score in the district court, we direct that on remand the state be permitted to develop the record regarding the out-of-state convictions.

## FACTS

Hshee's conviction stems from injuries suffered by his infant child, I.R.H., while in Hshee's care. By amended complaint, the state charged Hshee with third-degree assault—victim under four years of age, felony domestic assault, and malicious punishment of a

---

[1] Hshee argues that the state's failure to prove his intent to cause bodily harm requires reversal of his third-degree assault conviction as well as reversal of the jury's guilty verdicts on two other charges for which he was not adjudicated guilty or sentenced. Because Hshee was not adjudicated guilty of those other two offenses and because we conclude that the evidence is sufficient to sustain the third-degree-assault conviction, we do not address the other offenses. *See State v. Ashland*, 287 N.W.2d 649, 650 (Minn. 1979); *State v. Moua*, 678 N.W.2d 29, 42 n.10 (Minn. 2004).

child under four years of age. The following factual summary is derived from the testimony and exhibits admitted at Hshee's jury trial.

Hshee and P.N. are the parents of I.R.H., who was born in June 2023. On December 16, 2023, P.N. was scheduled to work at her employer grocery store, but she called in and said that her daughter was hurt and that she was going to stay home to take care of her. That same morning, P.N. spoke with her coworker, S.P., over a video call. S.P. saw I.R.H., who was five months old at the time, on the video call and was concerned because I.R.H. had bruises and swelling on her face. P.N. told S.P. that I.R.H. had fallen out of a hammock. That same day, S.P. also saw a picture of I.R.H. with the bruises and swelling. S.P. told her boss, E.R., about it because she was concerned that the incident was not just an accident.

E.R. saw the photo of I.R.H. and observed that I.R.H. had bruising on her face and body. E.R. was concerned that the child needed medical attention, and she called law enforcement. E.R. did not ask P.N. how I.R.H. got the bruises.

Marshall police officers responded to E.R.'s call and met her at the workplace. E.R. showed the officers the photograph of I.R.H. Three officers then went to Hshee and P.N.'s home.

When the officers arrived at the home, P.N. let them inside. Officer Brunsvold asked if P.N. spoke English, and she responded that she spoke some. Officer Brunsvold attempted to question P.N.; it eventually became clear that "the understanding wasn't there," so Officer Brunsvold utilized a language line to access an interpreter via the phone. While waiting for the language line to provide an interpreter, P.N. brought I.R.H. to Officer

Brunsvold. Officer Brunsvold noted that I.R.H.'s left eye was "partially swollen shut; she had significant bruising on the left side of her face, across her forehead, and bruising on the front and back side of her left ear." The officers were told that I.R.H. fell out of a hammock that was used as a crib and hit her face on the foot or leg of the frame. They were also informed that, at the time of the injury, I.R.H. was at home in the care of Hshee. The officers observed that the hammock was adult-sized and attached to a metal frame over a carpeted floor in the bedroom. The hammock was approximately 18 to 24 inches deep, and the bottom of the hammock was approximately 15-24 inches from the floor. The officers saw that Hshee was in a bedroom while they were talking with P.N. He did not come out to speak with the officers.

The officers were told that medical treatment had not been sought for I.R.H. The officers requested an ambulance. I.R.H. was evaluated by ambulance personnel and was then brought to the emergency room, where she was examined by an emergency room physician, Dr. Hindbjorgen. The officers took photographs of I.R.H.'s injuries.

P.N. went to the hospital with the police, but Hshee did not go. While P.N. and I.R.H. were at the hospital, Hshee texted P.N., in English: "Why you have a big mouth" and "Who call the police?"

Dr. Hindbjorgen observed multiple bruises scattered over various areas of I.R.H.'s body, including on her front, back, and sides and towards the neck, as well as a subconjunctival hematoma, which is a patch of bleeding in the white of the eye. Dr. Hindbjorgen noted that I.R.H. was acting normal and alert and "seemed pretty calm and content." Dr. Hindbjorgen also observed birth marks from a skin condition (dermal

4

melanocytosis) on I.R.H.'s lower back. Dr. Hindbjorgen noted that "it can be a challenge" to distinguish between a birth mark of the type on I.R.H.'s back and a bruise. CAT scans and x-rays of I.R.H. revealed no bleeding in I.R.H.'s skull and no previous or current broken bones or fractures. Tests showed that I.R.H. did not have a blood disorder or other abnormality that would explain bruising on her body. Dr. Hindbjorgen testified that the injuries observed "would not have been consistent with" falling out of a hammock and hitting a metal bar on the floor. Dr. Hindbjorgen referred I.R.H. to Child's Voice at the Sanford medical facility in Sioux Falls.

At Child's Voice, Nurse Practitioner Wharton assessed I.R.H. for injuries on December 17 and 18, 2023, and examined I.R.H. again at a follow-up appointment on January 3, 2024. Wharton noted bruising on I.R.H.'s upper chest and "widespread [bruising] on the face and head." Wharton testified that subconjunctival hemorrhages can occur spontaneously but can also be associated with trauma and that, given the number of injuries around I.R.H.'s eye, "it would fit for it to be related to trauma." Wharton did not think the injuries were consistent with falling out of a hammock because the injuries were on multiple planes of I.R.H.'s face, rather than on one plane of impact from a fall. She could not say "with a medical certainty" that I.R.H. did not fall from the hammock. Wharton testified that, based on her follow-up examination of I.R.H. after the injuries had resolved, she believed that spots on I.R.H.'s shoulders, back, and lower right leg were dermal melanocytosis spots, but that the marks on I.R.H.'s scalp, forehead, and eyes and the discoloration on the cheek were bruises because they had resolved. Both Wharton and Dr. Hindbjorgen testified that injuries on the ear and eyelids can be indicative of abuse.

5

Although P.N. testified that, when I.R.H. was injured, she was crawling "little by little" and could roll over, Wharton observed that I.R.H. was not able to sit unassisted. Dr. Hindbjorgen did not assess I.R.H.'s development, but he did not observe her sitting unassisted or rolling. Wharton thought it unlikely that I.R.H. would have been able to pull herself or cause a fall out of the hammock.

On December 20, 2023, Detective Sandgren interviewed Hshee using an interpreter on the language line. During the interview, Hshee told Detective Sandgren that he woke up to I.R.H. crying and lying on her chest on the floor. Hshee later said that maybe I.R.H. had been injured by her three-year-old brother or at the hospital. Hshee said that he did not seek medical care for I.R.H. because he did not speak English.

According to P.N.'s testimony, on December 15—the day before the police came to their home—Hshee called her while she was at a store and told her that I.R.H. had fallen off the hammock while Hshee was asleep. P.N. said they did not bring I.R.H. to the hospital because she was worried about her children being taken away and she didn't think the injuries were severe.

The jury found Hshee guilty of all three charges. The district court convicted Hshee of third-degree assault, sentenced him to 15 months' imprisonment, with execution stayed for five years, and placed him on probation. In calculating Hshee's criminal-history score, the district court relied on previous convictions from Tennessee.

Hshee appeals.

**DECISION**

**I.     The evidence is sufficient to sustain Hshee's third-degree assault conviction.**

Hshee argues that the state did not prove beyond a reasonable doubt that he acted intentionally to inflict bodily harm on I.R.H. and that his conviction for third-degree assault must therefore be reversed.[2]

Hshee was convicted of third-degree assault of a child under four years of age. *See* Minn. Stat. § 609.223, subd. 3 (2022). Under the third-degree-assault statute, "[w]hoever assaults another and inflicts substantial bodily harm" is guilty of a crime. *Id.*, subd. 1 (2022). The definition of "assault" includes "the intentional infliction of or attempt to inflict bodily harm upon another." Minn. Stat. § 609.02, subd. 10 (2022). The assault-harm offense is a general-intent crime, requiring the state to prove that the defendant "intended to do the physical act" but not that the defendant "meant to violate the law or cause a particular result." *State v. Fleck*, 810 N.W.2d 303, 309 (Minn. 2012).

When reviewing the sufficiency of the evidence to support a conviction, appellate courts "painstakingly review the record to determine whether that evidence, viewed in the

---

[2] As noted in footnote 1 above, on the same basis, Hshee also challenges the sufficiency of the evidence to support the jury's guilty verdicts on the charges of malicious punishment of a child and domestic assault, but we address only the offense of which Hshee was adjudicated guilty. For the same reason, we do not address a second argument that Hshee makes with respect to the guilty verdict for felony domestic-assault—that his prior out-of-state convictions do not satisfy the definition of a qualified domestic-violence-related offense, which enhances a domestic-violence offense to a felony. *See* Minn. Stat. §§ 609.02, subd. 16 (Supp. 2023), .2242, subd. 4 (2022).

7

light most favorable to the verdict, was sufficient to permit the jurors to reach the verdict that they did." *State v. Hassan*, 977 N.W.2d 633, 639-40 (Minn. 2022).

As the parties agree, whether Hshee acted intentionally to inflict bodily harm on I.R.H. depends on circumstantial evidence. When an element of an offense necessarily depends on circumstantial evidence, appellate courts apply a "heightened two-step standard of review." *State v. Isaac*, 9 N.W.3d 812, 815 (Minn. 2024). At the first step, an appellate court identifies the circumstances proved. *State v. Silvernail*, 831 N.W.2d 594, 598 (Minn. 2013). In identifying the circumstances proved, appellate courts defer "to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State." *State v. Porte*, 832 N.W.2d 303, 310 (Minn. App. 2023) (citing *State v. Andersen*, 784 N.W.2d 320, 329 (Minn. 2010)). In other words, appellate courts "assume that the jury believed the State's witnesses and disbelieved the defense witnesses," construing conflicting evidence in the light most favorable to the verdict. *Silvernail*, 831 N.W.2d at 599.

At the second step, appellate courts examine "whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *Silvernail*, 831 N.W.2d at 599 (quotations omitted). The appellate court "independently consider[s] the reasonable inferences that can be drawn from the circumstances proved, when viewed as a whole." *State v. Harris*, 895 N.W.2d 592, 601 (Minn. 2017). Appellate courts "give no deference to the fact finder's choice between reasonable inferences" at this second step. *Silvernail*, 831 N.W.2d at 599 (quotation omitted). To sustain a conviction, "[c]ircumstantial evidence must form a complete chain that, as a whole, leads so directly

to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *State v. Hanson*, 800 N.W.2d 618, 622 (Minn. 2011). The state need not remove all doubt, but "must remove all reasonable doubt." *Id.*

We begin with the circumstances proved. We outlined in detail above the circumstances proved that are relevant to establishing that Hshee intentionally caused bodily harm to I.R.H. Briefly, they include that I.R.H. was in Hshee's care on December 15, 2023, that he called P.N. to tell her that I.R.H. had been hurt by falling out of a hammock, that P.N. saw injuries on I.R.H. and stayed home from work on December 16 because of the injuries, that I.R.H. suffered injuries that were not consistent with a fall from the hammock, that Hshee texted P.N. when she was at the hospital with I.R.H. and referenced her having "a big mouth," and that Hshee gave shifting explanations for I.R.H.'s injuries.

Hshee argues that the circumstances proved are not consistent with guilt—specifically, he contends that they are not consistent because they prove only that he was in the room with I.R.H. when she was injured. Analogizing to aiding and abetting, Hshee cites *State v. Mahkuk*, for the principle that a person's mere presence at the scene of a crime is not sufficient to find that a person is guilty of aiding and abetting a crime. 736 N.W.2d 675, 682 (Minn. 2007). But the reasonable inferences from the circumstances proved here are not limited to Hshee's mere presence at the scene while I.R.H. was injured. Based on the totality of circumstances proved, it is reasonable to infer that Hshee acted intentionally to cause I.R.H.'s injuries.

Hshee argues, though, that the state did not present evidence about how he could have actually caused I.R.H.'s injuries. The argument is unavailing. The state did question Dr. Hindbjorgen about how the injuries could have occurred, and he testified that the injuries he observed are indicative of "some sort of blunt force trauma." Dr. Hindbjorgen testified that hitting, punching, kicking, twisting, pulling, or being struck could cause the kind of injuries that he observed on I.R.H. Wharton also testified that the injuries indicate "direct trauma to the area," which could include hitting the area or causing pressure or injury to the area. In a circumstantial-evidence case, the "nature of injuries and their possible causes" testified to by a medical expert are treated as "medical 'facts' that a reviewing court must take as proved." *State v. Stewart*, 923 N.W.2d 668, 674 (Minn. App. 2019), *rev. denied* (Minn. Apr. 16, 2019).

Hshee next maintains that the circumstances proved are consistent with a rational hypothesis other than guilt—specifically, that, while Hshee was sleeping, I.R.H. rolled or moved and fell, causing her injuries. But that is not a reasonable inference from the circumstances proved. Both Wharton and Dr. Hindbjorgen testified that the injuries to multiple planes of I.R.H.'s body were not consistent with a fall. In addition, Hshee and P.N. avoided seeking medical care for I.R.H. Also, Hshee avoided contact with officers in the home, texted P.N., "Why you have a big mouth," and asked who called the police. While an individual circumstance proved could conceivably have a different explanation, the only reasonable inference that can be drawn from the totality of the circumstances proved is that I.R.H. acted intentionally to cause the injuries suffered by I.R.N.

10

Our ruling in *Stewart* is instructive. In *Stewart*, we upheld the defendant's conviction of assault of a child despite the fact that the state did not have direct evidence of the exact circumstances of the child's serious injuries. *Id.* at 675. There, the child's mother went into the child's bedroom immediately after the defendant had been alone with the child and was yelling at him, and she found the child on the floor having a seizure. *Id.* at 671. The child had suffered significant brain injury. *Id.* We concluded that, based on the totality of the circumstances, including the nature of the child's injuries, the absence of an accident to explain the injuries, and the impossibility of the child having caused the injuries himself, the only reasonable inference from the circumstances proved was that the defendant intentionally inflicted great bodily harm on the child. *Id.* at 675.

Although Hshee claimed that an accident occurred when I.R.H. fell out of the hammock, this hypothesis is implausible because a fall is not consistent with I.R.H.'s injuries. Viewed as a whole, the circumstances proved do not support a reasonable inference that I.R.H.'s injuries were caused by an accidental fall from a hammock. Because the circumstances proved are consistent with a rational hypothesis of guilt and inconsistent with any other rational hypothesis, the evidence is sufficient to support Hshee's conviction of third-degree assault. *See Silvernail*, 831 N.W.2d at 599.

**II.    The district court erred in calculating Hshee's criminal-history score because the state did not meet its burden of proof on the out-of-state convictions.**

Hshee argues that his sentence must be reversed and that he must be resentenced with a lower criminal-history score because the state failed to prove that three prior out-of-state convictions should be included in his criminal-history score. The state concedes there

is insufficient evidence in the record to support inclusion of the out-of-state convictions in Hshee's criminal-history score and requests reversal and remand for resentencing, permitting the state an opportunity to further develop the record regarding Hshee's criminal-history score.

While Hshee did not raise this issue to the district court, "a defendant may not waive review of his criminal history score calculation." *State v. Maurstad*, 733 N.W.2d 141, 147 (Minn. 2007). Appellate courts review a district court's criminal-history-score calculation for an abuse of discretion. *State v. Oreskovich*, 915 N.W.2d 920, 926 (Minn. App. 2018). A sentence based on an incorrect criminal-history score must be remanded for resentencing. *State v. Woods*, 945 N.W.2d 414, 416-17 (Minn. App. 2020). "The state has the burden of proving by a preponderance of the evidence the facts necessary to justify consideration of out-of-state convictions in determining a defendant's criminal history score." *State v. Outlaw*, 748 N.W.2d 349, 355 (Minn. App. 2008) (quotation omitted), *rev. denied* (Minn. July 15, 2008). An unsubstantiated list of prior convictions on a sentencing worksheet is not sufficient to prove that the convictions should be applied to a defendant's criminal-history score. *State v. Maley*, 714 N.W.2d 708, 711 (Minn. App. 2006).

Under the Minnesota Sentencing Guidelines, generally, targeted misdemeanors and gross misdemeanors result in a "unit" for purposes of a defendant's criminal-history score. Minn. Sent'g. Guidelines 2.B.3.a (Supp. 2023). The accumulation of four units results in one criminal-history point. Minn. Sent'g. Guidelines 2.B.3 (Supp. 2023). Targeted misdemeanors are defined under Minnesota Statutes section 299C.10, subdivision 1(e)

(2022), and include misdemeanor driving while impaired (DWI), fifth-degree assault, and domestic assault. *Id.*

In order to include an out-of-state conviction in a defendant's criminal-history score, the district court must determine "the equivalent Minnesota offense based on the elements of the prior non-Minnesota offense." Minn. Sent. Guidelines 2.B.5.b (Supp. 2023). The district court must consider "the sentence imposed" and "whether the offense is defined as a felony, gross misdemeanor, or a targeted misdemeanor in Minnesota." *Id.*

Hshee was sentenced with a criminal-history score of one. Hshee's sentencing worksheet indicates five units, resulting in one criminal history point. The following prior offenses were listed at one unit each: DWI (gross misdemeanor); DWI—refusal (gross misdemeanor); domestic assault (misdemeanor); DWI (misdemeanor); and simple assault (misdemeanor). Three of these convictions are out-of-state convictions from Tennessee—namely, the convictions for misdemeanor assault, misdemeanor domestic assault, and a DWI. To support a determination of 4 units, equating to one criminal-history point, at least two of Hshee's misdemeanor convictions would have to qualify as targeted misdemeanors under Minnesota law.

The state concedes that the record does not contain any evidence of Hshee's Tennessee DWI conviction beyond a reference to it in Hshee's presentence investigation report and the sentencing worksheet. The state also notes that during trial the district court received certified copies of Hshee's Tennessee convictions for misdemeanor assault and misdemeanor domestic assault, but it also notes that it did not specifically submit those records at sentencing. Additionally, the state agrees "that there was no meaningful

13

comparison by the district court regarding the elements of the submitted Tennessee offenses and their Minnesota equivalents." On this record, the state failed to prove that the out-of-state convictions should be considered in Hshee's criminal-history score, and the district court thus erred in calculating his criminal-history score as one.

Hshee did not object to his criminal-history score in the district court. When a defendant does not object to the inclusion of out-of-state convictions in the criminal-history score in the district court, the remedy is reversal and remand for resentencing, giving the state the opportunity "to further develop the sentencing record so that the district court can appropriately make its determination." *Outlaw*, 748 N.W.2d at 356. Because we conclude that the district court erred in calculating Hshee's criminal-history score, we reverse and remand for resentencing, allowing the state to further develop the record on Hshee's out-of-state convictions.

**Affirmed in part, reversed in part, and remanded.**